2000 OK 55

**Julie BARNES, Plaintiff/Appellee,**

**and**

**Michael Barnes, by and through his mother and next friend, Julie Barnes, Plaintiff,**

v.

**OKLAHOMA FARM BUREAU MUTUAL INSURANCE COMPANY, Defendant/Appellant.**

No. 89,745.

Supreme Court of Oklahoma.

July 18, 2000.

As Corrected July 25, and Aug. 9, 2000.

Dissenting Opinion Corrected Dec. 19, 2000.

As Corrected Jan. 16, 2001.

James A, Scimeca of Miller, Dollarhide, Dawson & Shaw and Joe E. White, Jr. of the White Law Firm, Oklahoma City, Oklahoma, for Appellee.

Robert B. Mills, Stefan K. Doughty and Margaret K. Myers of Mills & Associates, P.C., Oklahoma City, Oklahoma, for Appellant.

LAVENDER, J.

¶ 1 Appellee, Julie Barnes (Barnes or insured) sued appellant, Oklahoma Farm Bureau Mutual Insurance Company (insurer) in contract to recover underinsured motorist (UIM) benefits and in tort for breach of the implied duty to act in good faith and to deal fairly with her as its insured. The trial judge granted partial summary judgment to Barnes for the $15,000 UIM policy limits and that, by its actions, insurer had waived any claim to subrogation from the tortfeasor. A jury additionally awarded her $10,000 actual and $1.5 million punitive damages on the tort theory of liability, and the trial judge granted her $300,000 in attorney fees. In a prior appeal, the Court of Civil Appeals (COCA) affirmed the partial summary judgment. *Barnes v. Oklahoma Farm Bureau Mut. Ins. Co. (Barnes I )*, 1993 OK CIV APP 168, 869 P.2d 852.[1] In this appeal insurer asserts errors relating to the tort theory of liability and the attorney fee award. The COCA affirmed in all respects. We previously granted certiorari review.

¶ 2 We hold: 1) the jury was presented sufficient evidence to find insurer breached

---

1. We note that the partial summary judgment ruling of the trial court was certified as a final judgment for immediate appeal pursuant to 12 O.S.1991, § 1006. *See now* 12 O.S. Supp. 1999, § 994.

the implied duty of good faith and fair dealing; 2) the trial judge did not err by submitting the issue of punitive damages to the jury or in lifting the statutory cap on such damages; 3) the punitive damage award is not excessive; and 4) adherence to the American Rule regarding the recovery of attorney fees requires reversal of the trial judge's attorney fee award and remand of that issue to the trial court for further consideration. Accordingly, we affirm the judgment based on the jury verdict, but reverse the attorney fee award and remand that matter back to the trial court for further proceedings.

## PART I.  STANDARD OF REVIEW ON APPEAL.

¶ 3 The review standard regarding legal actions tried to a jury is:

In an action at law, a jury verdict is conclusive as to all disputed facts and all conflicting statements, and where there is any competent evidence reasonably tending to support the verdict of the jury, [an appellate court] will not disturb the jury's verdict or the trial court's judgment based thereon. Where such competent evidence exists, and no prejudicial errors are shown in the trial court's instructions to the jury or rulings on legal questions presented during trial, the verdict will not be disturbed on appeal. In an appeal from a case tried and decided by a jury an appellate court's duty is not to weigh the evidence and determine which side produced evidence of greater weight, i.e. it is not an appellate court's function to decide where the preponderance of the evidence lies—

that job in our system of justice has been reposed in the jury. In a jury-tried case, it is the jury that acts as the exclusive arbiter of the credibility of the witnesses. Finally, the sufficiency of the evidence to sustain a judgment in an action of legal cognizance is determined by an appellate court in light of the evidence tending to support it, together with every reasonable inference deducible therefrom, rejecting all evidence adduced by the adverse party which conflicts with it. (citations omitted) [2]

*Florafax Intern., Inc. v. GTE Market Resources, Inc.,* 1997 OK 7, 933 P.2d 282, 287. The standard applies to cases involving an insurer's alleged breach of the implied duty of good faith and fair dealing. *McCorkle v. Great Atlantic Ins. Co.,* 1981 OK 128, 637 P.2d 583, 586.

¶ 4 Unlike the review standard as to factual questions, issues of law are reviewed *de novo* and an appellate court has plenary, independent and non-deferential authority to reexamine a trial court's legal rulings. *State ex rel. Jones v. Baggett,* 1999 OK 68, ¶ 4, 990 P.2d 235; *Neil Acquisition, L.L.C. v. Wingrod Investment Corp.,* 1996 OK 125, 932 P.2d 1100, 1103 fn. 1.

## PART II.  FACTUAL AND PROCEDURAL BACKGROUND.[3]

¶ 5 Barnes was injured in a head-on collision with another motorist in January 1991 [*Barnes I,* 869 P.2d at 853]; her injuries required fairly extensive medical treatment; and Barnes, a physical therapist, missed periods of work due to her injuries.[4]  Shun

---

**2.** Evidence may be direct or circumstantial. Direct evidence is that which may persuade the fact finder of the existence of a fact without the necessity of drawing any inferences therefrom. *Sides v. John Cordes, Inc.,* 1999 OK 36, ¶ 14 fn. 14, 981 P.2d 301. Circumstantial evidence is that from which inferences must be drawn in determining the existence of a disputed fact. *Id.*

**3.** The factual matters in our discussion (unless otherwise indicated) are based on evidence submitted at trial. As set out in **PART I, STANDARD OF REVIEW,** an appellate court in a law action decides whether there is sufficient evidence to sustain a judgment in light of the evidence tending to support it, together with all reasonable inferences deducible therefrom, rejecting evidence of the adverse party which con-

flicts with it. *Park v. Security Bank and Trust Company,* 1973 OK 72, 512 P.2d 113, 118. Our evidentiary recitation conforms to this standard. Further, to the extent Oklahoma Farm Bureau Mutual Insurance Company (insurer) questions in its appellate submissions the credibility of certain witnesses, these credibility questions were for the jury to unravel, not this Court, as **PART I** makes clear.

**4.** Julie Barnes' (Barnes or insured) minor son was also injured in the collision. Any claim regarding him was apparently settled [*Barnes v. Oklahoma Farm Bureau Mut. Ins. Co. (Barnes I ),* 1993 OK CIV APP 168, 869 P.2d 852, 853 fn. 2], and although a party to the suit in the trial court, no claim of his is involved in this appeal.

Donaldson, driver of the other car involved, had liability insurance with a $10,000 per person limit. Two policies provided uninsured/underinsured motorist (UM/UIM) coverage. The one with insurer had a $15,000 per person limit; the other, with State Farm Mutual Automobile Insurance Company (State Farm), a $25,000 per person limit.

¶ 6 By the end of August 1991 Barnes had incurred about $15,000 in medical bills. She also had lost wages over $10,000. A claim was made to recover UIM benefits from insurer and State Farm. In August she also sued Donaldson in tort and the two UIM insurers to recover under both policies. Believing its handling of her claim over the next several months was unreasonable, Barnes supplemented her petition to sue insurer for breach of the implied duty of good faith and fair dealing in March 1992.

¶ 7 In mid–1992 the trial judge granted partial summary judgment to Barnes for the $15,000 UIM policy limit and ruled insurer, by its actions, had waived its subrogation rights under 36 O.S.1991, § 3636(E). However, she did not receive the $15,000 nor was she finally able to accept a $10,000 liability limit settlement offer from Donaldson and his liability carrier until *Barnes I* became final in 1994, i.e. until all avenues of appellate review concerning the partial summary judgment were exhausted by insurer. *Barnes I* was decided in October 1993 and certiorari review denied by this Court in February 1994.

¶ 8 That part of the suit for breach of the implied duty of good faith and fair dealing had been stayed pending resolution of the appeal in *Barnes I*, 869 P.2d at 853. After *Barnes I*, the case returned to the trial court and the tort theory of liability was tried to a jury in 1997. A main defense of insurer was: its handling of the UIM claim was reasonably based on its counsel's advice concerning the

proper interpretation of § 3636(E) and, thus, its behavior in seeking a judicial forum to resolve what it supposedly considered a legitimate dispute as to the meaning of § 3636(E) could not be found tortious. Before jury submission, the trial judge lifted the cap on punitive damages, permissively allowing the jury to award punitive damages in an amount exceeding that awarded for actual damages. He also ruled the issue of whether Barnes was entitled to attorney fees, and the amount thereof, was subject to his post-verdict consideration and was not an issue for jury resolution and ascertainment as an item of damage recoverable as part of her tort theory of liability, as argued by insurer.

## PART IIA. INSURER'S TREATMENT OF BARNES' UIM CLAIM.

■ ¶ 9 Initially, Barnes' husband apparently attempted to deal with any insurance claim. Within weeks of the accident, however, she retained counsel to represent her. An adjustor with insurer understood by the end of February 1991 the matter might turn into an UIM claim and in August 1991, he concluded Donaldson's liability seemed clear, i.e. his negligence caused the accident. As set out in *Barnes I* [869 P.2d at 853], the collision occurred while Donaldson was driving left of the center-line. Further, though insurer itself failed to evaluate her claim to determine the complete extent of her injuries or damages and it never placed a total monetary value on the claim, insurer's counsel either conceded to Barnes' counsel, or agreed with him there was no serious question, her damages were, at least, $50,000 (i.e. at least the amount of all available insurance coverage) prior to the time Barnes supplemented her petition to sue for bad faith.[5]

¶ 10 Instead of evaluating her claim to determine the complete extent of her injuries or damages or placing some reasonable value on the claim, insurer essentially took the

---

5. As will become apparent, to a large extent insurer acted through its counsel in handling the underinsured motorist (UIM) claim and, as noted in the text, a main defense was reliance on counsel's advice. Thus, sometimes when we refer to insurer we are referring either to insurer directly or as acting by and through its counsel. Even if breach of the implied duty of good faith and fair dealing was, in part, due to actions of its counsel, rather than acts or omissions on its part directly, insurer would still be subject to liability. We ruled over seventeen (17) years ago that an insurer could not avoid liability for breach of the duty of good faith and fair dealing by delegating its responsibility to an independent contractor. *Timmons v. Royal Globe Ins. Co.*, 1982 OK 97, 653 P.2d 907, 914. In short, the duty owed to the insured is nondelegable.

following stance concerning Barnes' claim. In November 1991 insurer's counsel informed insurer that Donaldson's liability carrier would offer Barnes his liability limits of $10,000 to settle the case on his behalf. Also, although in November insurer did inform Barnes' counsel it would tender the $15,000 UIM limit to Barnes, no check for $15,000 was actually issued until February 1992 and the check was never sent to Barnes or her attorney, but was retained by insurer's counsel. At least in part, the reason(s) the check was never actually sent to Barnes was because of the parties' "dispute" regarding who would be entitled to Donaldson's liability coverage if Barnes accepted the check and because, prior to the check's issuance, Barnes had given notice to insurer under § 3636(E) of a tentative settlement with Donaldson for his $10,000 liability limits. The "dispute" arose over insurer's contention, based on its counsel's advice, that once it paid $15,000 to Barnes, it, rather than her would be entitled to Donaldson's $10,000 in liability coverage via a right of subrogation.

¶ 11 Though multiple specific shortcomings were presented to support Barnes' position that insurer breached its duty of good faith and fair dealing (e.g. failure to properly investigate the UIM claim, failure to make swift/prompt payment and failure to pay undisputed amounts), a central focus of her claim was insurer's response to the § 3636(E) notice of a tentative settlement with Donaldson for his liability policy limits sent to both UIM insurers in December 1991. Subsection 3636(E)(2) requires that, within sixty (60) days of the notice's receipt a UIM carrier must either substitute its own payment for the tentative settlement amount— i.e. it must pay its insured the amount of the tentative settlement—or, be deemed to have waived any subrogation rights against the tortfeasor for any amount paid under the UIM coverage. Of course, if the UIM carrier substitutes, the insured would not finally accept the tentative settlement because the UIM carrier would have substituted its payment for that offered by the tortfeasor and his liability carrier. Further, upon proper substitution, in addition to protecting its subrogation rights for any benefits paid under the UIM coverage, § 3636(E)(2) expressly

provides that the UIM carrier is also entitled to any ultimate recovery (by settlement or judgment) from the tortfeasor, to the extent of the payment made in substitution of the tentative settlement.

¶ 12 Again, based on its counsel's advice, instead of making a true substitution for the tentative settlement as intended by § '3636(E)(2), insurer did actually send to Barnes' counsel a draft for $10,000, **but maintained said check was both a part of the $15,000 UIM coverage and a proper substitution for the tentative liability limits settlement, which it would be entitled to recover back from any of Donaldson's assets, including his liability policy.** It further insisted it now owed her only $5,000 under the UIM coverage. The $10,000 draft was accompanied by a receipt and partial release Barnes was supposed to execute before negotiating the draft. This document released insurer from $10,000 of its UIM obligation and, in effect, prohibited her from settling with Donaldson. In other words, insurer clung to the position that once it paid Barnes either $15,000 **or** $10,000, it, rather than her, would reap the benefit of or have a rightful claim of entitlement to the $10,000 liability coverage and, in effect, its ultimate or actual UIM responsibility to her was only $5,000.

¶ 13 Barnes, with her counsel's advice, refused to execute the receipt and partial release given that her signature on it would basically acknowledge agreement with insurer's position. The $10,000 draft was also returned and her counsel demanded insurer pay the $15,000 in UIM coverage to her, **and either** substitute its own $10,000 payment for the tentative liability limits settlement with Donaldson or waive its subrogation rights— the latter which would have allowed Barnes to finally accept the $10,000 tentative settlement with Donaldson and his liability carrier.

¶ 14 Insurer would not waive its subrogation rights or alter its position that the $10,000 was **both** a proper substitution under § 3636(E) **and** a part of the $15,000 in UIM benefits it owed to Barnes, which $10,000 it, rather than her would be entitled to recover back from Donaldson's $10,000 in liability

coverage. It also never actually tendered to Barnes the additional $5,000 in UIM benefits. In effect, insurer's stance prevented settlement with Donaldson for his liability limits—in fact, the evidence was unquestionably sufficient to show insurer's express purpose was to block Barnes' attempt to settle with Donaldson for his liability limits because insurer claimed entitlement to the liability coverage once it paid either $10,000 **or** $15,000 to her. Insurer's stance also prevented any final resolution of the UIM claim and required the "dispute" between it and Barnes to be litigated.[6]

¶ 15 Insurer insisted on litigating its purported "dispute" with Barnes even though the evidence was plainly sufficient to show any reasonable evaluation of her claim would have been, at least, $50,000—i.e. the combined limits of Donaldson's liability policy and the two UIM policies, and that insurer and/or its counsel either knew this or would have known it had a reasonable evaluation been made of her claim. Further, insurer's claim of entitlement to Donaldson's liability coverage was taken even though it knew Barnes' special damages alone equaled or exceeded $25,000 (i.e. Donaldson's liability limit plus insurer's UIM limit) and insurer did not claim entitlement to any credit or reduction as to its UIM liability by virtue of the coverage provided by the other UIM insurer, State Farm.

¶ 16 The response of State Farm—the other UIM carrier—to the § 3636(E) notice was unlike insurer's response. Having evaluated her claim to be, at least, $50,000, State Farm merely paid its UIM limit of $25,000, without claiming entitlement to recover part of the payment back from Donaldson's $10,000 in liability coverage. Further, concluding Donaldson had no assets other than the liability policy, State Farm decided not to substitute its own $10,000 payment for the tentative settlement—instead waiving any subrogation rights as to its $25,000 UIM payment to Barnes.

¶ 17 As explained in more detail in **PART III**, *infra,* the advice insurer received from its counsel as to how to handle Barnes' UIM claim was patently unreasonable; it was contrary to the dictates of § 3636; it conflicted with then existing jurisprudential authority; and directly conflicted with an express provision of the insurance policy insurer issued to Barnes and her husband. Further, evidence was submitted sufficient to support a finding no attorneys that represented insurer in UM/UIM matters other than the counsel that represented it in the Barnes' case gave the same advice to it concerning the "interpretation" of § 3636 it adopted in the Barnes' case and, in fact, all other lawyers representing insurer in UM/UIM matters disagreed with the "interpretation" so adopted. The evidence was also sufficient to show any reasonable insurer would have understood that underinsurance under Oklahoma law provides

**6.** In its appellate submissions insurer repeatedly asserts the inappropriateness of holding it in bad faith because it offered to pay Barnes $15,000 in UIM coverage, which she refused to accept. Although insurer tried to show and argue before the jury that such was the case, the jury obviously rejected its arguments in such regard. As we view the record, competent evidence (or reasonable inference deducible therefrom) was submitted to show insurer's initial offer to pay $15,000 was tied to its assertion that once Barnes accepted, insurer would be entitled to the tortfeasor's liability coverage. Furthermore, as set out in the text, insurer never sent a $15,000 check to Barnes or her counsel and the evidence supports a finding part of the reason it did not was because of its unreasonable position in response to the 36 O.S.1991, § 3636(E) notice that a $10,000 payment by it to Barnes could be considered **both** a substitution for the tentative settlement offer from the tortfeasor **and** as a payment of part of the UIM coverage it owed to Barnes. We

also note the record supports findings the $15,000 check (apparently retained by insurer's counsel) was only issued February 7, 1992; the $10,000 check actually sent to Barnes' counsel was issued February 10, 1992; the $15,000 check was voided by insurer by February 13, 1992; and insurer never offered to both substitute $10,000 for the tentative settlement with the tortfeasor and pay its $15,000 in UIM coverage to Barnes. We also note that insurer's attempt—which was refused by the trial court—to pay into court $15,000 after Barnes had already requested the trial judge to allow her to supplement her petition to sue for bad faith, was not required to be deemed by the jury a viable defense to the bad faith claim. Otherwise, every insurer, after being sued for bad faith withholding of payment, could merely pay the money into court and be protected from a bad faith claim, no matter how egregious, unfounded or unreasonable its earlier conduct of withholding payment.

coverage to an insured when the tortfeasor's liability coverage is insufficient to compensate the insured for injuries suffered and that Barnes was entitled to both the $15,000 in UIM coverage **and** the $10,000 from Donaldson's liability coverage [or its substituted equivalent from insurer under § 3636(E)].

¶ 18 The evidence also warranted findings insurer was merely using a baseless argument concerning "interpretation" of § 3636(E) in an attempt to gain a tactical advantage in settlement negotiations with Barnes concerning her UIM claim and that one or more officials with insurer understood it was not making a true substitution under § 3636(E), but attempting to argue it could retain its subrogation rights anyway. The evidence also sufficiently showed that no reasonable insurer could have understood the $10,000 draft sent to Barnes could be considered **both** a true substitution under § 3636(E) for the tentative settlement **and** a part of the UIM coverage it owed to Barnes; but that any reasonable insurer would have understood the advice of its counsel was nothing other than a feigned/artificial attempt to reduce or take a credit against its UIM limit of liability based upon the liability coverage of the tortfeasor, Donaldson.

¶ 19 With Barnes the attempt to gain a tactical advantage in settlement negotiations was ultimately unsuccessful; although, as previously noted, she did not actually receive the $15,000 in UIM benefits nor was she allowed to finally settle with Donaldson for his $10,000 in liability coverage until 1994, i.e. until insurer had exhausted all avenues of appeal concerning *Barnes I*. However, evidence was submitted sufficient to show that insurer's treatment of Barnes was not an isolated incident, but that insurer, by and through its counsel, had used the same or similar unreasonable tactic with other UIM insureds repeatedly, i.e. relying on an unfounded claim to the tortfeasor's liability cov-

erage in an attempt to settle disputes with its UIM insureds for less than they were rightfully owed under their UIM coverage.[7]

## PART III. THE ADVICE INSURER RECEIVED FROM ITS COUNSEL WAS UNTENABLE AND THE JURY WAS ENTITLED TO FIND INSURER DID NOT HAVE A REASONABLE/GOOD FAITH BELIEF IN THAT ADVICE.

¶ 20 As already stated, a main defense of insurer was: it allegedly reasonably relied on its counsel's advice concerning the proper interpretation of § 3636(E) and, thus, its behavior in seeking a judicial forum to resolve, what it supposedly considered, a legitimate dispute could not be considered bad faith. The legitimate dispute defense is grounded in the following passage from *Christian v. American Home Assur. Co.*, 1977 OK 141, 577 P.2d 899, 904–905: [8]

> We do not hold that an insurer who resists and litigates a claim made by its insured does so at its peril that if it loses the suit or suffers a judgment against it for a larger amount than it had offered in payment, it will be held to have breached its duty to act fairly and in good faith and thus be liable in tort.
>
> We recognize that there can be disagreements between insurer and insured on a variety of matters such as insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy conditions. Resort to a judicial forum is not per se bad faith or unfair dealing on the part of the insurer regardless of the outcome of the suit. Rather, tort liability may be imposed only where there is a clear showing that the insurer unreasonably, and in bad faith, withholds payment of the claim of its insured.

Insurer claims a reasonable basis for its actions and, under Oklahoma law, bad faith

---

7. Evidence was submitted that in one such other case insurer was successful in convincing its insured to settle for a substantial amount less than what should have been paid in UIM benefits.

8. *Christian v. American Home Assur. Co.*, 1977 OK 141, 577 P.2d 899 is a leading case recognizing the implied duty of good faith and fair deal-

ing owed by insurers to their insureds. The duty extends to all types of insurance companies [*McCorkle v. Great Atlantic Ins. Co.*, 1981 OK 128, 637 P.2d 583, 588], and applies to companies providing UIM coverage. *See Buzzard v. Farmers Ins. Co., Inc.*, 1991 OK 127, 824 P.2d 1105.

cannot exist if an insurer's conduct was reasonable under the circumstances. *See Manis v. Hartford Fire Ins. Co.*, 1984 OK 25, 681 P.2d 760 ; *Buzzard v. Farmers Ins. Co., Inc.*, 1991 OK 127, 824 P.2d 1105, 1109 (insurer may resist payment and litigate claim when it has reasonable defense); Durbin and Loy, *Current Status of Good Faith Law in Oklahoma*, 24 Okla. City U.L.Rev. 155, 157–159 (1999).

¶ 21 Although we agree a decision to withhold or delay payment, if based on a legitimate dispute or reasonable justification (legal or factual) cannot form the basis of bad faith tort liability—and in such a situation an insurer does not act at its peril in seeking judicial resolution of the dispute—the corollary of this recognition is that, a claim must be promptly paid unless the insurer has a reasonable belief the claim is either legally or factually insufficient. *Buzzard, supra*, 824 P.2d at 1109. In our view, the evidence at trial, in light of the law readily available to insurer and its counsel when handling Barnes' claim, plainly warranted findings no legitimate dispute or reasonable justification existed for the manner insurer dealt with Barnes and that insurer did not have a reasonable belief in its counsel's advice. To understand that the evidence was plainly sufficient for a finding insurer's actions were unreasonable, only a rudimentary appreciation of underinsurance motorist coverage under Oklahoma law—both statutory and jurisprudential—is necessary.[9]

¶ 22 Title 36 O.S.1991, § 3636 mandates uninsured motorist coverage be offered in every insurance policy insuring a vehicle unless waived by the insured. *Buzzard, supra*, 824 P.2d at 1110. Subsection 3636(C) includes within the definition of "uninsured motor vehicle" vehicles which are underinsured and, thus, the coverage applies where the tortfeasor either has no insurance or an insufficient amount to satisfy the insured's claim. *Buzzard*, 824 P.2d at 1110. Subsection 3636(C) provides in pertinent part:

> For the purposes of this coverage the term "uninsured motor vehicle" shall also include an insured motor vehicle, the liability limits of which are less than the amount of the claim of the person or persons making such claim, regardless of the amount of coverage of either of the parties in relation to each other.

¶ 23 Eighteen (18) months before Barnes' accident this Court expressed the meaning of § 3636(C) in the following language: "[a]n insured must be allowed to look to [her UIM] insurer when the liability limits of the negligent motorist prevent the insured from recovering fully [for] the injuries suffered." *State Farm Auto. Ins. Co. v. Greer*, 1989 OK 110, 777 P.2d 941, 943. The advice of its counsel directly conflicted with this Court's prior expression of the meaning of § 3636(C). Here, counsel's advice was that insurer had some rightful claim to Donaldson's liability coverage once it paid any benefits to Barnes, even though the liability coverage was clearly insufficient to allow her full recovery for her injuries; her damages equaled, at least, all the insurance coverage available; and insurer knew this, or would have known it had a reasonable evaluation been made of her UIM claim. Further, because insurer never disputed that Barnes' claim was worth, at least, $25,000 (Donaldson's liability limit plus insurer's UIM limit) and it claimed no entitlement to any credit or reduction as to its UIM liability by virtue of the coverage provided by the other UIM insurer, State Farm, insurer's assertion of some rightful claim to Donaldson's liability coverage is simply mystifying and absolutely insupportable.[10]

---

9. Insurer's argument that its actions—based on its counsel's "interpretation" of § 3636(E)—cannot be deemed unreasonable because one Court of Civil Appeals' (COCA) judge dissented to the majority opinion in *Barnes I* and one Justice of this Court dissented to our February 15, 1994 denial of certiorari review in *Barnes I* (i.e. the denial of certiorari was by an 8 to 1 vote) is unavailing. The COCA judge dissented without opinion and there is no fit way to gauge the exact rationale behind the dissent. Likewise, the dissent to certiorari denial was unaccompanied by a published explanation. These unamplified dissents do not provide any real support that the claimed "dispute" put forward by insurer was a legitimate or reasonable basis for the manner in which it handled Barnes' UIM claim. Certainly, they provide no conclusive indicia of same.

10. Although not cited in its appellate submissions, insurer relied in the trial court, in part, on *Roberts v. Mid–Continent Cas. Co.*, 1989 OK CIV

¶ 24 A review of § 3636(E) also reveals the patent unreasonableness of counsel's advice. That provision—in plain, explicit and unambiguous language—forecloses an UIM insurer from doing what insurer attempted to do to Barnes. It provides:

E. **In the event of payment to any person under the coverage required by this section and subject to the terms and conditions of such coverage, the insurer making such payment shall, to the extent thereof, be entitled to the proceeds of any settlement or judgment resulting from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury for which such payment is made,** including the proceeds recoverable from the assets of the insolvent insurer. Provided, however, with respect to payments made by reason of the coverage described in subsection C of this section, the insurer making such payment shall not be entitled to any right of recovery against such tort-feasor in excess of the proceeds recovered from the assets of the insolvent insurer of said tort-feasor. **Provided further, that any payment made by the insured tort-feasor shall not reduce or be a credit against the total liability limits as provided in the insured's own uninsured motorist coverage. Provided further, that if a tentative agreement to settle for liability limits has been reached with an insured tort-feasor, written notice shall be given by certified mail to the uninsured motorist coverage insurer by its insured.** Such written notice shall include:

1. Written documentation of pecuniary losses incurred, including copies of all medical bills; and

2. Written authorization or a court order to obtain reports from all employers and medical providers. **Within sixty (60) days of receipt of this written notice, the uninsured motorist coverage insurer may substitute its payment to the insured for the tentative settlement amount. The uninsured motorist coverage insurer shall then be entitled to the insured's right of recovery to the extent of such payment and any settlement under the uninsured motorist coverage. If the uninsured motorist coverage insurer fails to pay the insured the amount of the tentative tort settlement within sixty (60) days, the uninsured motorist coverage insurer has no right to the proceeds of any settlement or judgment, as provided herein, for any amount paid under the uninsured motorist coverage.** (emphasis added)

Although never really set forth in any of its briefs in this appeal, in essence, insurer argued below that because the first sentence of § 3636(E) provides that: "[i]n the event of payment to any person [of UIM] coverage ... [an] insurer making such payment shall ... be entitled to the proceeds of any settlement or judgment resulting from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury for which such payment is made [ ]", there was a reasonable argument that upon its payment of either $15,000 or $10,000 to Barnes, it was entitled to or had some rightful claim to Donaldson's $10,000 liability limits. This argument is manifestly untenable.

¶ 25 The goal of statutory interpretation is to discern legislative intent. *Neer v. Oklahoma Tax Com'n,* 1999 OK 41, ¶ 15, 982 P.2d 1071. Where a statutory provision is plain and unambiguous, and the meaning clear and unmistakable, no justification exists to fabricate a different meaning. *Id.* at ¶ 16. Further when reviewing a statute for its meaning, relevant provisions must be considered together, where possible, to give force and effect to each. *Ledbetter v.*

APP 92, 790 P.2d 1121 to support its stance that once it paid UIM benefits to Barnes it could lay claim to Donaldson's liability coverage based on its subrogation rights. *Roberts* does **not** support insurer's stance. In *Roberts,* the UIM coverage was sufficient to provide full recovery for the reasonable value of all of the insured's injuries.

In such a situation the UIM carrier would, indeed, become entitled to its insured's rights of recovery against the tortfeasor and the tortfeasor's liability carrier, **when the UIM carrier pays to its insured the full amount of his/her damages, a situation unlike the present one.**

*Oklahoma Alcoholic Beverage Laws Enforcement Com'n*, 1988 OK 117, 764 P.2d 172, 179.

¶ 26 To understand § 3636(E) one cannot merely take out of context one sentence or part of a sentence, but the provision must be read in its entirety, including the other portions of § 3636(E) we have highlighted. When one does this it is unmistakable the highlighted portion of the first sentence of § 3636(E) cannot provide a basis, in this case, for insurer's claim to Donaldson's liability coverage.

¶ 27 Firstly, we note that Barnes could not merely accept the settlement offer made by Donaldson and his liability carrier for his $10,000 liability limits and give a general release therefor, because if she had she would have run the risk of forfeiting her own UIM coverage with insurer. This is so because this Court ruled in *Porter v. MFA Mut. Ins. Co.*, 1982 OK 23, 643 P.2d 302 an insured who voluntarily and knowingly makes a settlement with and gives a general release to the tortfeasor, is precluded from bringing an action against their own UM/UIM carrier because such action on the insured's part destroys the UM/UIM carrier's subrogation rights against the tortfeasor. Subsection 3636(E)(1)-(2) provides a mechanism by which an insured can receive the equivalent of a settlement offer from the tortfeasor, while at the same time protecting the UIM carrier's subrogation rights against the wrongdoer.

¶ 28 To protect its subrogation right(s) once notified of a tentative liability limits settlement, a UIM carrier must "substitute its payment to the insured for the tentative settlement amount" and "then [it will] be entitled to the insured's right of recovery to the extent of such payment **and** any settlement under the [UIM] coverage." § 3636(E)(2)(emphasis added). If no substitution is made the UIM "insurer has no right to the proceeds of any settlement or judgment, as provided herein, for any amount paid under the [UIM] coverage." § 3636(E)(2).

¶ 29 It is unmistakable from reading § 3636(E)(2) that a substituted payment for the tentative settlement being offered by Donaldson could not conceivably also be considered as a payment under the UIM coverage, the position taken by insurer. It is also unmistakable that a substitution for a tentative liability limits settlement offer, in order to protect the UIM carrier's subrogation rights, **does not** relieve the UIM carrier of its responsibility to pay to its insured the full amount of underinsurance coverage when a reasonable evaluation of the insured's injuries/damages equal or exceed the limits of both the tortfeasor's liability coverage and the UIM coverage. As the COCA correctly noted in *Barnes I*, "[a]lthough [insurer's] 'exposure' in this case is $25,000 if it had properly substituted Donaldson's [tentative] settlement, insurer would have been subrogated to Barnes' right to $10,000 and would only pay out the amount that it had contracted with Barnes to provide[,]" i.e. $15,000—the latter amount also subject to potential recoupment by the UIM insurer from any available assets of the tortfeasor.

¶ 30 Not only was counsel's "interpretation" at odds with the unambiguous language of § 3636(E)(2), it was contrary to the proviso immediately preceding the substitution provisions of § 3636(E): "that any payment made by the insured tort-feasor shall not reduce or be a credit against the total liability limits as provided in the insured's own [UIM] coverage[ ]" and a provision of the policy it issued to Barnes stating: "[a]ny payment made by **or on behalf of** [an underinsured motorist] shall not reduce or be a credit against our [UIM] limit of liability." (emphasis added).[11] We recognized in 1982 that the clear intention of the legislature in regard to the above § 3636(E) proviso was that payments made by a tortfeasor should not diminish an injured party's recovery under their own policy. *Chambers v. Walker*, 1982 OK 128, 653 P.2d 931, 935. In our view, the jury was entitled to conclude it was simply beyond the pale that insurer could legitimately argue a payment that is supposed to be made by the UIM carrier **in substitution**

---

11. The provision is found in the policy at PART C–UNINSURED MOTORIST COVERAGE, E(2), OUR LIMIT OF LIABILITY.

for one offered by the tortfeasor—in order for the carrier to protect its subrogation rights—could be considered anything other than a payment made **on behalf of the underinsured tortfeasor** or that it could be used, as insurer attempted to use it in this case, to reduce, or act as a credit against, its limit of liability under the UIM coverage.

¶ 31 In a tort case against an insurer for breach of the implied duty of good faith and fair dealing (i.e. for bad faith) it is the unreasonableness of the insurer's actions that is the essence of the tort. *Conti v. Republic Underwriters Ins. Co.,* 1989 OK 128, 782 P.2d 1357, 1360; *Alsobrook v. National Travelers Life Ins. Co.,* 1992 OK CIV APP 168, 852 P.2d 768, 770. Although reliance on the advice of counsel can be a defense to a bad faith suit, the reliance on counsel's advice must be reasonable. Durbin and Loy, *Current Status of Good Faith Law in Oklahoma, supra,* 24 Okla. City U.L.Rev. at 169–170. Particularly applicable here is the following statement made by the United States Court of Appeals for the Fifth Circuit concerning the advice of counsel defense in bad faith insurance claim litigation:

> [I]t is simply not enough for the carrier to say it relied on advice of counsel, however unfounded, and then expect that valid claims for coverage can be denied with impunity pursuant to such advice. The advice of counsel is but one factor to be considered in deciding whether the carrier's reason for denying a claim was arguably reasonable. We believe that where, through verbal sleight of hand, the advising attorney concocts an imagined loophole in a policy whose plain language extends coverage, such advice is heeded at the carrier's risk.

*Szumigala v. Nationwide Mutual Ins. Co.,* 853 F.2d 274, 282 (5th Cir.1988). Further, even where there has been no judicial interpretation of a relevant statutory provision, the reasonableness of reliance on advice of counsel will normally be a fact question where counsel misreads the plain language of a statute. *Murphree v. Federal Ins. Co.,* 707 So.2d 523, 532–535 (Miss.1997).

¶ 32 The ultimate question is whether sufficient evidence was presented to show insurer's purported reliance on its attorney's advice was unreasonable. We think so. The evidence warranted findings counsel's advice was wholly unfounded; it was contrary to the unmistakable meaning of the relevant provision(s) of § 3636; it was at odds with existing case law recognizing the legislative intent behind underinsurance coverage; it was inconsistent with a provision of the insurance policy issued to Barnes; and was nothing other than verbal sleight of hand. Sufficient evidence was presented to show insurer could not have had a good faith/reasonable belief that its counsel's advice was reasonable or provided a legitimate basis for its treatment of Barnes' UIM claim. Instead, the jury was entitled to conclude insurer was unreasonably attempting to reduce or take a credit against its own UIM responsibility for the amount Donaldson was offering to pay to Barnes, while at the same time arguing it could protect its subrogation rights against him without compliance with the unambiguous relevant terms of § 3636(E).

¶ 33 In effect, insurer never really offered to pay Barnes any more than $5,000 in UIM coverage. As stated in *Barnes I* [869 P.2d at 855]:

> The tendered $10,000.00 was not a "substitution" of Donaldson's insurer's settlement [offer] but a tender of only a portion of the [UIM] benefits which Barnes was due. Under [insurer's] rationale, [it] would tender $15,000.00 to Barnes and [ ] would receive Donaldson's $10,000.00 in liability benefits, making [its] net payment [only] $5,000.00. Or [insurer] could tender $10,000.00 to Barnes in "substitution" of Donaldson's $10,000.00 settlement [offer], and [it] would have full subrogation against Donaldson for $10,000.00. Under this last scenario, [insurer] would tender only $5,000.00 which would be its UIM limit after the $10,000.00 "substitution". In either case, all [insurer] really offered Barnes was $5,000.00 of her contracted coverage, $15,000.00.

Insurer's actions forced Barnes into approximately two years of unnecessary litigation concerning her UIM claim, even though any reasonable evaluation of her injuries/damages would have shown her entitlement to

the full amount of UIM coverage from insurer **and** the $10,000 from Donaldson's liability limits settlement offer [or its equivalent from insurer under § 3636(E)]. The bottom line here is: the jury had before it sufficient evidence to find insurer's treatment of Barnes' UIM claim was patently unreasonable; at a minimum, insurer acted in reckless disregard of its duty of good faith and fair dealing toward her; and its actions were taken in a bad faith attempt to delay or withhold the rightful insurance benefits to which she was entitled.

## PART IV. WE CAN FIND NO ERROR IN THE TRIAL JUDGE'S DECISIONS TO SUBMIT THE ISSUE OF PUNITIVE DAMAGES TO THE JURY OR TO LIFT THE CAP ON SUCH DAMAGES.

■ ¶ 34 This Court has recognized the availability of punitive damages in a bad faith case is not automatic, but is governed by the standard applicable in other tort cases. *Buzzard, supra*, 824 P.2d at 1115. The statute controlling the award of punitive damages in this case was 23 O.S.1991, § 9.[12] It provided:

A. In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example, and by way of punishing the defendant, in an amount not exceeding the amount of actual damages awarded. Provided, however, if at the conclusion of the evidence and prior to the submission of the case to the jury, the court shall find, on the record and out of the presence of the jury, that there is clear and convincing evidence that the defendant is guilty of conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed, then the jury may give damages for the sake of example, and by way of punishing the defendant, and the

percentage limitation on such damages set forth in this section shall not apply.

B. The provisions of this section shall be strictly construed.

Section 9 provides two levels for an award of punitive damages. *Sides v. John Cordes, Inc.*, 1999 OK 36, ¶ 11, 981 P.2d 301. Which level a jury may consider is determined by which, if either, of two different preliminary findings is made by the trial judge. *Id.* If the trial judge decides there is any competent evidence demonstrating the defendant has engaged in a wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed, the judge must submit to the jury a capped plea for punitive damages, i.e. in an amount not exceeding actual damages. *Id.* However, if the judge finds clear and convincing evidence of such delineated conduct he/she must submit to the jury the plea for uncapped punitive damages. *Id.*; *Rodebush By and Through Rodebush v. Oklahoma Nursing Homes, Ltd.*, 1993 OK 160, 867 P.2d 1241, 1246–1247. The question of whether there is clear and convincing evidence sufficient to lift the cap presents an issue of law to be made by the trial judge. *Id.* Clear and convincing evidence is that measure or degree of proof which produces in the mind of the fact finder a firm belief or conviction as to the truth of the allegation(s) sought to be established. *State ex rel. Oklahoma Bar Ass'n v. Green*, 1997 OK 39, 936 P.2d 947, 949; *Matter of C. G.*, 1981 OK 131, 637 P.2d 66, 71 fn. 12.

¶ 35 Insurer challenges both the trial judge's decision to submit the punitive damage issue to the jury at all and to allow the jury to award such damages in an uncapped amount based on his determination there was clear and convincing evidence of, at least, one of the enumerated factors specified in § 9. We have already set out much of the evidence supporting the trial court's determination to submit the issue of punitive damages to the jury in **PART II**, *supra*. In **PART**

---

12. 23 O.S.1991, § 9 was repealed by 1995 Okla. Sess. Laws, Ch. 287, § 4 and replaced by 23 O.S. Supp.1995, § 9.1. *Sides v. John Cordes, Inc.*, note 2 *supra*, 1999 OK 36 at ¶ 10 fn. 6, 981 P.2d at 304. The instant case, however, was tried under § 9 because § 9.1(G) provides that "[§ 9.1] shall apply to all civil actions filed after [August 25, 1995]." Barnes initially filed suit in 1991 and supplemented in 1992 to sue for breach of the implied duty of good faith and fair dealing.

**III,** *supra,* we have explained why the advice insurer was receiving from its counsel was utterly untenable and could not have been reasonably relied on by insurer. No purpose would be served by repeating these matters here.

¶ 36 It is quite clear from our recitation and analysis above, the trial judge had before him evidence that warranted findings insurer had no actual defense to Barnes' UIM claim; its assertion of a rightful claim to Donaldson's liability coverage was not based on any reasonable or legitimate ground, but was merely a feigned or contrived attempt to gain some advantage in regard to settling Barnes' UIM claim; and insurer's unreasonable treatment of Barnes was not an isolated incident, but the same or similar tactic was used by insurer repeatedly with other insureds. Our review of the record convinces us there was clear and convincing evidence supporting a determination, at a minimum, insurer acted in reckless disregard for the rights of Barnes and a finding of a complete indifference to its duty to treat her UIM claim fairly.[13] Therefore, we find no error in the trial judge's decisions to submit the punitive damage issue to the jury or to lift the cap on such damages under § 9.

## PART V. THE PUNITIVE DAMAGE AWARD IS NOT EXCESSIVE.

¶ 37 Insurer also challenges on appeal the purported excessiveness of the $1.5 million punitive damage award assessed by the jury. The COCA did not reach the issue on the ostensible bases insurer failed to raise the issue below and it was, therefore, not preserved for appellate review. In effect, the COCA determined insurer failed to preserve the excessiveness issue for appellate review because insurer could have, and should have, raised the excessiveness issue by virtue of a motion for new trial under 12 O.S.1991, § 651(Fourth)(excessive damages

appearing to have been given under the influence of passion or prejudice) or by virtue of a motion for remittitur.[14] We disagree with the COCA because under our current appellate procedural regime there was no requirement the issue be made the subject of a motion for new trial or remittitur in order to preserve it for appellate review.

¶ 38 Title 12 O.S.1991, § 991(a) provides in pertinent part that "[t]he right of a party to perfect an appeal from a judgment, order or decree of the trial court to the Supreme Court shall not be conditioned upon his having filed in the trial court a motion for new trial . . ." Before passage of § 991(a) in 1968 [1968 Okla. Sess. Law, Ch. 395, § 1], in order for a party to preserve for appellate review an issue relating to a judgment or final order, the party was required to file a motion for new trial in the trial court. *See Stokes v. State,* 1965 OK 155, 410 P.2d 59 and *Benham v. Keller,* 1983 OK 68, 673 P.2d 152, 153 fn. 1. "A new trial is a reexamination in the same court, of an issue of fact, or of law, either or both, after a verdict by a jury, the approval of the report of a referee, or a decision by the court." § 651; *Stokes v. State,* 410 P.2d at 60. The Legislature, by § 991(a), abrogated the rule that a motion for new trial on an issue was required before that issue could be raised on appeal. In our view, the plain intent of § 991(a) was to relieve a party, who has already raised an issue in the trial court, of the burden of having to raise the same issue a second time through a motion for new trial.

¶ 39 Here, insurer's excessiveness issue essentially challenges the sufficiency of the evidence to support a $1.5 million punitive damage verdict and, in our view, such challenge was preserved because insurer at all appropriate times challenged the propriety of submitting, for the jury's consideration, the issue of punitive damages. Insurer demurred to

---

13. Although some of the evidence supporting lifting the cap on punitive damages may be categorized as circumstantial, such acknowledgment does not doom the trial judge's decision. The § 9 cap may properly be lifted based on circumstantial evidence. *Rodebush By and Through Rodebush v. Oklahoma Nursing Homes, Ltd.,* 1993 OK 160, 867 P.2d 1241, 1248–1249.

14. We cite to the 1991 version of § 651 because it was in effect at the time this matter was tried and when the trial judge entered judgment on the jury verdict. We note, however, § 651 was amended slightly in 1999, but the amendments have no effect on our decision in this case. *See* 12 O.S. Supp. 1999, § 651 and 1999 Okla. Sess. Laws, Ch. 293, § 3.

Barnes' evidence on the issue of punitive damages at the close of her case in chief and the trial judge overruled the demurrer. Insurer also asked for a directed verdict and objected to lifting the cap on punitive damages at the close of all the evidence. The trial judge denied the directed verdict quest and, as discussed in **PART IV** in the text, the trial judge lifted the cap on punitive damages. Finally, insurer objected to submitting the issue of punitive damages to the jury by virtue of its objection to Trial Court Jury Instruction No. 18, the punitive damage instruction, which permissively allowed the jury to award punitive damages in an amount exceeding actual damages.[15]   In view of these objections that challenged, at every turn, the propriety of punitive damages in this case and the legislative abrogation, via § 991(a), of conditioning an appeal upon the filing of a motion for new trial, there was no requirement, in this case, for insurer to ask the trial judge for a reexamination, by new trial or remittitur, of the $1.5 million jury verdict. The COCA, accordingly, erred by failing to review the excessive punitive damage issue raised by insurer on appeal.  We now address the issue.

¶ 40 Even though we determine the issue was properly preserved and is subject to appellate review, in our opinion, no valid reason has been put forward by insurer to reverse or modify downward the amount of punitive damages awarded by the jury. Punitive damages are allowed for the benefit of society as punishment. *Chandler v. Denton,* 1987 OK 38, 741 P.2d 855, 868. The purpose of a punitive damage award is to provide a restraint upon, and serve as a warning and example to, the wrongdoer [*Id.*] and to deter others from the commission of similar wrongs. *Timmons v. Royal Globe Ins. Co.,* 1982 OK 97, 653 P.2d 907, 919. A punitive damage verdict lies peculiarly within the province of the jury and will not be casually interfered with on appeal. *Chandler v. Den-*

*ton,* 741 P.2d at 868. Unless such a verdict appears to be grossly excessive or the result of the jury's passion, prejudice or improper sympathy, it will not be conditioned on a remittitur. *Id.*

¶ 41 As to the amount of punitive damages—if any was allowed by the jury—Instruction No. 18 guided the jury's discretion by setting out the factors specified in Oklahoma Uniform Jury Instructions (OUJI), Civil, Instruction No. 5.5. The factors were: the harm caused or likely to be caused by insurer's conduct; the degree of wrongfulness of the conduct; how long the conduct lasted and whether it was likely to continue; whether insurer engaged in other similar conduct and, if so, how often; insurer's awareness of its conduct and its consequences, and whether it attempted to conceal the conduct; whether insurer benefitted from the conduct and, if so, whether the benefit should be taken away; the need to discourage others from similar conduct; and the financial resources of insurer. Insurer does not challenge on appeal the substantive correctness of Instruction No. 18 in regard to such factors. Nor, in our view, has insurer shown that the jury was motivated in its assessment of the proper amount of punitive damages by passion, prejudice or improper sympathy.

¶ 42 As we have already detailed in previous parts of this opinion, insurer's handling of Barnes' UIM claim was patently unreasonable and the jury was entitled to find insurer had absolutely no valid defense to her claim. It was proper for the jury to conclude insurer's handling of her claim was wholly reckless and exhibited a complete indifference to its duty to treat the UIM claim fairly. The evidence sufficiently showed any reasonable insurer would have understood that Barnes was entitled to both the $15,000 in UIM coverage **and** the $10,000 from Donaldson's liability coverage [or its substituted equivalent from insurer under § 3636(E) ]. Yet,

---

15. The instruction given was a slightly modified version of that found at Oklahoma Uniform Jury Instructions (OUJI), Civil, Instruction No. 5.5, one modification being **deletion** of the last sentence of Instruction 5.5, which provides, "[i]n no event should the punitive damages exceed the amount of actual damages awarded." The only other modification was that fraud was **not** listed

as an enumerated factor, obviously because the trial court determined fraudulent conduct was not engaged in by insurer. Oklahoma Uniform Jury Instructions, Civil, Instruction 5.5, Notes on Use, provides that a trial court should include in a punitive damage instruction only the type of conduct shown to have been engaged in by a defendant.

insurer unreasonably deprived Barnes of these benefits for an extended period of time and it forced her to litigate her entitlement to the full $25,000 based on an untenable argument insurer had some valid claim to Donaldson's liability coverage.

¶ 43 The jury was also entitled to find insurer was merely using a purported "interpretation" of § 3636(E) as a ploy to gain a tactical advantage in settlement negotiations with Barnes concerning her UIM claim and that one or more officials with insurer understood it was not making a true substitution under § 3636(E). The evidence also supported a finding any reasonable insurer would have understood the advice of its counsel was nothing other than a feigned/artificial attempt to reduce or take a credit against its UIM limit of liability based upon the liability coverage of the tortfeasor, Donaldson. The jury was also entitled to find that insurer's treatment of Barnes was not an isolated incident, but that insurer, by and through its counsel, had used the same or similar unreasonable tactic with other UIM insureds repeatedly, i.e. relying on an unfounded claim to the tortfeasor's liability coverage in an attempt to settle disputes with its UIM insureds for less than they were rightfully owed under their UIM coverage. There was also evidence presented concerning the financial wealth/resources of insurer.

¶ 44 In light of the evidence presented in this record, we simply cannot say a $1.5 million punitive damage award is somehow grossly excessive or the result of passion, prejudice or improper sympathy. To rule otherwise would merely be an improper replacement of our verdict for that given by the jury, something we are not willing or warranted in doing. Accordingly, we uphold the punitive damage award and determine insurer's claim of excessiveness is without merit.

**PART VI. ADHERENCE TO THE AMERICAN RULE REGARDING THE RECOVERY OF ATTORNEY FEES REQUIRES REVERSAL OF THE TRIAL JUDGE'S ATTORNEY FEE AWARD AND REMAND OF THAT ISSUE TO THE TRIAL COURT FOR FURTHER CONSIDERATION.**

¶ 45 As set out in **PART II**, *supra*, the trial judge ruled the issue of whether Barnes was entitled to attorney fees, and the amount thereof, was subject to his post-verdict consideration and was not an issue for jury resolution and ascertainment as an item of damage recoverable as part of her tort theory of liability. After the jury trial was concluded Barnes moved for the recovery of attorney fees and the trial judge, after considering the parties' legal arguments and holding an evidentiary hearing, determined she was entitled to attorney fees in the amount of $300,000. Relying on *Brashier v. Farmers Ins. Co., Inc.*, 1996 OK 86, 925 P.2d 20, insurer asserts that Barnes waived her right to recover attorney fees because she failed to submit attorney fees to the jury as an element of her damage recovery for insurer's bad faith treatment of her UIM claim. Barnes argues *Brashier* does not stand for the proposition that attorney fees was a jury question. In that 1) *Brashier* has engendered confusion on attorney fee recoverability in UM/UIM litigation by an insured against his/her insurer; 2) *Brashier* does support insurer's argument that the attorney fee issue should have been submitted to the jury for resolution as an element or item of damage under Barnes' tort theory of recovery; 3) *Brashier* misinterpreted the import of *Christian, supra* as to the potential for the recovery of attorney fees in UM/UIM litigation between an insured and his/her insurer; and 4) *Brashier*, in our view, exhibited an unwarranted deviation from the American Rule concerning the allowance of attorney fees, we decide in this case that *Brashier*, to the extent it held a UM/UIM insured plaintiff is entitled to recover attorney fees as a common law element of damage for an insurer's bad faith refusal to settle a UM/UIM loss, should be overruled. We also reverse the trial judge's award of attorney fees to Barnes and remand to the trial court for a determination, upon proper application of Barnes, as to whether attorney fees are recoverable by her under some recognized exception to the American Rule, and, if so, the amount of the fees recoverable.

¶ 46 In Oklahoma, the right of a litigant to recover attorney fees is governed

by the American Rule. *TRW/Reda Pump v. Brewington,* 1992 OK 31, 829 P.2d 15, 22. This Rule is firmly established in Oklahoma [*Id.*] and provides that courts are without authority to award attorney fees in the absence of a specific statute or a contractual provision allowing the recovery of such fees, with certain exceptions. *Id.* This Court has ruled that exceptions to the American Rule are narrowly defined. *Kay v. Venezuelan Sun Oil Co.,* 1991 OK 16, 806 P.2d 648, 650. Here, no statute or contractual basis has been put forward to support an award of attorney fees in favor of Barnes. Accordingly, the award of fees must have as its basis some exception to the American Rule. That exception is currently found in *Brashier v. Farmers Ins. Co., Inc., supra.*

¶ 47 *Brashier,* like the present case, involved a suit by an insured against his UM carrier for breach of the implied duty of good faith and fair dealing. 925 P.2d at 23. One of the issues in *Brashier* was whether, as victor against his UM carrier for bad faith refusal to pay an insurance loss, the insured was entitled to recover a counsel fee. *Id.* at 22. This Court held even though a statute [36 O.S.1991, § 3629(B)] expressly disallows recovery of counsel fees by the prevailing party in an action to enforce UM coverage, such disallowance did not foreclose an insured from the recovery of counsel fees as an element of the insured's damage recovery for insurer's bad faith refusal to pay the claim. 925 P.2d at 23–25, 27. Section 3629(B) allows for the recovery of attorney fees in insurance-related litigation in the following language:

B.   It shall be the duty of the insurer, receiving a proof of loss, to submit a written offer of settlement or rejection of the claim to the insured within ninety (90) days of receipt of that proof of loss. Upon a judgment rendered to either party, costs and attorney fees shall be allowable to the prevailing party. For purposes of this section, the prevailing party is the insurer in those cases where judgment does not exceed written offer of settlement. In all other judgments the insured shall be the prevailing party. If the insured is the prevailing party, the court in rendering judgment shall add interest on the verdict at the rate of fifteen percent (15%) per year from the date the loss was payable pursuant to the provisions of the contract to the date of the verdict. **This provision shall not apply to uninsured motorist coverage.** (emphasis added)

As can be readily seen by the bolded language, § 3629(B) excludes uninsured motorist litigation from its ambit.

¶ 48 Notwithstanding the exclusion, *Brashier* relied on *Christian, supra* to hold that attorney fees were a part of the common law damages an insured was entitled to recover when such fees were incurred or caused by the insurer's bad faith withholding of the policy benefits. *See Brashier, 925 P.2d* at 24. *Brashier* misinterpreted and misapplied *Christian.* In *Christian* the insured was a participant in a group disability policy. 577 P.2d at 900. He sustained an injury leaving him permanently and totally disabled. *Id.* He made claim under the disability policy with the insurer, but the insurer refused to pay him any benefits under the policy. *Id.* Insured sued the insurer in contract to recover the maximum amount of benefits due under the policy in the District Court of Garvin County. *Id.* Although insurer refused to pay the disability claim and fully litigated the contract action, it became apparent during trial that insurer did not have, and had never had, a defense to its insured's claim. *Id.* The insured won a judgment for the maximum policy benefits, plus interest. *Id.* The insured then sued insurer in the District Court of Oklahoma County seeking to impose liability on insurer for its bad faith refusal to pay his valid disability claim. *Id.* Part of the damages he sought in the Oklahoma County case were the attorney fees he expended in prosecuting the Garvin County action. *Id.* In other words, the attorney fees purportedly caused by the insurer's bad faith refusal to pay his disability claim.

¶ 49 Although in *Christian* the attorney fees expended in prosecuting the Garvin County action **were sought** by the insured as part of the damages purportedly caused by the insurer's bad faith refusal to pay his disability claim, this Court **did not** approve their recovery as an element of damage

**180**

caused by the refusal to pay the disability claim. What *Christian* held was that the attorney fees the insured expended in prosecuting the Garvin County action were potentially recoverable from the insurance company—as a recognized equitable exception to the American Rule—if the trial court in the second action brought on a tort theory of recovery found the insurance company had engaged in litigation misconduct in the Garvin County action. *Christian, supra,* 577 P.2d at 906.

¶ 50 *Christian* cited to *City National Bank & Trust Co. v. Owens,* 1977 OK 86, 565 P.2d 4 to support this holding. *Christian, supra,* 577 P.2d at 906. *Owens* had recognized the inherent equitable authority of a court to award attorney fees when an opponent in litigation has acted in bad faith, vexatiously, wantonly or for oppressive reasons. 565 P.2d at 7–8. *Owens* upheld the power of a trial court to award **limited** attorney fees where a party litigant plaintiff engaged in the following oppressive litigation actions: bringing the controversy in litigation to trial, taking the opportunity to test the strength and weakness of the case, then after the close of all the evidence, after the instructions had been decided upon, dismissing the matter without prejudice—thus causing necessary expenses to be wasted by the defendant(s) and causing the parties, attorneys, citizens and court employees to waste a considerable amount of time, money and effort. 565 P.2d at 8. The fees taxed against the plaintiff were those incurred by defendant(s) for the actual trial and trial preparation unnecessarily and wastefully brought about by the oppressive litigation misconduct of the plaintiff. In *Winters v. City of Oklahoma City,* 1987 OK 63, 740 P.2d 724, 726 this Court recognized that the inherent equitable power of a court to award attorney fees for abusive litigation practices delineated in *Owens* emanated from the inherent authority of courts to manage their affairs so as to achieve the orderly and timely disposition of cases.[16]

¶ 51 To the extent *Brashier* held attorney fees were recoverable by a UM/UIM insured against his/her insurance company as an element of the insured's damage recovery for a bad faith refusal to pay a claim, it is quite plain that *Brashier* misinterpreted *Christian* and went beyond the explicit holding of the *Christian* court. *Brashier* so held without mentioning or discussing the firm establishment of the American Rule in Oklahoma. If we were to follow *Brashier* here we would be led to the conclusion that, as a common law element of the damages caused by the tort, the determination of the recoverable fees must be made by the trier of fact, i.e. by the jury, unless the parties stipulate otherwise. Such is the case because 12 O.S.1991, § 556 provides:

> Issues of law must be tried by the court, unless referred. **Issues of fact arising in actions for the recovery of money,** or of specific real or personal property, **shall be tried by a jury,** unless a jury trial is waived, or a reference be ordered, as hereinafter provided. (emphasis added)

Obviously, the instant matter was a law action for the recovery of money. However, we cannot continue to follow *Brashier* because, as we have explained above, *Brashier* failed to follow the holding of *Christian* as to the potentiality for the recovery of attorney fees—i.e. an inherent equitable exception to the American Rule for bad faith, vexatious, wanton or oppressive litigation misconduct. Further, *Brashier* mistakenly interpreted the import of *Christian* to allow the recovery of attorney fees as part of the common law damages an insured was entitled to recover on the basis such fees were incurred or caused by the insurer's bad faith withholding of the policy benefits. Instead, we decide that *Brashier* should be and is overruled to the extent it improperly deviated from the American Rule.

**16.** In later cases discussing the *Owens* pronouncement that trial courts have the equitable power to award attorney fees in proper cases, this Court has stressed that the *Owens* declaration was not one of a broad, all-encompassing theory of equity. *Smith v. State ex rel. Dept. of Human Services,* 1990 OK 19, 788 P.2d 959, 962. The *Owens* exception is a narrow one, and it should be applied with a degree of caution and restraint. *Smith,* 788 P.2d at 962; *Wallace v. Halliburton Co.,* 1993 OK 24, 850 P.2d 1056, 1060–1061, quoting *Smith, supra.*

¶ 52 Although there are situations where a plaintiff may be able to recover attorney fees as part of his/her damages in either a contract or tort claim, neither the situation existent in *Brashier* nor the instant matter is one of them. The easiest understood example of when attorney fees are recoverable as damages is where an attorney sues his client to recover a reasonable attorney fee for services rendered when the client refuses to pay. *See Wolfe v. Campbell*, 1924 OK 785, 107 Okla. 112, 230 P. 506. In such a case, when the parties properly dispute the issue as to what amount, if any, should be recovered, the issue as to what would be a reasonable attorney fee for the services rendered is an issue of fact to be determined by the jury from the evidence presented. 230 P. at 506–507. Another example of when attorney fees are properly recoverable as an item of damage is when an insurance company has a contractual duty to defend its insured from lawsuits brought by third parties against the insured, but insurer wrongfully refuses to defend, necessitating the insured to employ his own counsel to defend the third party suit(s) brought against him. *Timmons v. Royal Globe Ins. Co.*, 1982 OK 97, 653 P.2d 907 is an illustration of this situation and involved an insurance company's wrongful refusal to defend a prior law action brought against the insured pilot by his passenger(s) after an airplane crash. 653 P.2d at 910 and 915. In other words, providing an attorney to defend claims made against the insured was part of the contractual duty of the insurance company, which was wrongfully and tortiously withheld. *See also Iowa Home Mutual Casualty Company v. Mussett*, 1959 OK 143, 342 P.2d 553, 554 *Third Syllabus* (insurer's failure to defend compensation claim within purview of worker's compensation policy issued by insurer constitutes breach of an obligation arising from an insurance contract and the insured employer may maintain an action at law against insurer to recover as an element of damages sustained by him the reasonable attorney fees incurred in defense of the compensation claim before the State Industrial Commission).

¶ 53 Yet another example is where the wrongful acts of the defendant have involved the plaintiff in litigation with others, or have placed him in such relation with others as to make it necessary for him to incur attorney fees to protect his interests, attorney fees being recoverable in such cases as one of the elements of damages flowing from the original wrongful act of the defendant. *Griffin v. Bredouw*, 1966 OK 226, 420 P.2d 546, 547, *Second Syllabus*. *Griffin* involved a situation where the purchasers of a completed house and lot were required to defend a lien foreclosure suit brought by a subcontractor because the vendor of the house and lot wrongfully refused to pay the subcontractor's bill for the erection of a fence—the vendor's refusal to pay the subcontractor's bill being in violation of his contract with the purchasers. *Griffin* held the purchasers were entitled to recover as an item of damage in a subsequent suit against the vendor, the attorney fees they were compelled to expend in defending the suit by the subcontractor. *See also Security State Bank of Comanche v. W.R. Johnston & Co., Inc.*, 1951 OK 40, 228 P.2d 169. Other than in the above examples, attorney fees are not normally allowed—in the absence of a contractual provision or specific statute allowing their recovery—as an element of damage or otherwise in either an action based on contract or tort. *See Hertzel v. Weber*, 1926 OK 318, 246 P. 839.

¶ 54 The situation in *Brashier*—as the situation in the present Barnes' matter—is unlike that dealt with by this Court in *Wolfe, Timmons* and *Griffin*. Obviously, *Wolfe* is distinguishable. Neither *Brashier* nor the instant matter involve a suit by an attorney to recover fees from a client for services rendered. *Timmons* is inapplicable because there a contractual duty existed to provide a defense to suits brought against the insured for the insured's liability to third parties, which was wrongfully withheld by the insurance company—i.e. the insurance company had a contractual duty to provide its insured with legal counsel when the insured was sued by his passengers. In *Brashier* and in the present case we are not dealing with the wrongful or tortious withholding of legal counsel in violation of contractual duty, but with the wrongful withholding of the monetary policy benefits. Finally, *Griffin* is distinguishable because neither in *Brashier* nor

Barnes is there any claim that the conduct of the insurer involved the insured in litigation with others, or placed either in such relation with others as to make it necessary to incur attorney fees to protect their interests.

¶ 55 In our view, to continue along the path seemingly charted by *Brashier* would be to undermine the firm establishment of the American Rule in Oklahoma without a solid rationale or stable foundation. It would also improperly expand those damages historically recognized as recoverable in both contract and tort cases. In short, we can no longer sanction the teaching of *Brashier* and remain true to the American Rule principle that attorney fees, with certain limited exceptions, are not recoverable in the absence of contractual provision or specific statutory authority allowing their recovery. If attorney fees are to be recoverable in UM/UIM litigation brought by an insured against his/her insurer, like that brought here by Barnes, in our view, it is the Legislature that must authorize such a course, as it has done for other types of insurer/insured litigation in § 3629(B).[17]

¶ 56 In that we have decided to no longer follow *Brashier* because it represents an incorrect exposition of Oklahoma law as to the recovery of attorney fees in this type of case and *Brashier* does support insurer's claim that error occurred by virtue of the trial judge deciding the attorney fee question, rather than submitting the issue to the jury as a recoverable item of damage under insured's claim for bad faith, we must reverse the attorney fee award of the trial judge. However, because Barnes did not have the benefit of our ruling in this case when fashioning her attorney fee quest in the trial court, we remand to the trial court to give her an opportunity to apply for fees under a recognized exception to the American Rule. As both *Christian* and *Owens* recognized, one such exception is, where an opponent engages in bad faith, wanton or oppressive litigation misconduct, a trial court, in the exercise of its inherent equitable power, may award attorney fees. Whether Barnes can prove herself entitled to such fees under the *Owens* exception will be a question for the trial court upon proper presentation of pleadings and proof. *See Christian, supra*, 577 P.2d at 906.[18]

## PART VII. CONCLUSION.

¶ 57 In summary, the jury was presented sufficient evidence to find insurer breached the implied duty of good faith and fair dealing. Further, the trial judge did not err by submitting the issue of punitive damages to the jury or in lifting the statutory cap on such damages. Insurer's appellate assertion the punitive damage award is excessive was preserved for appellate review; however, insurer has failed to show the punitive damage award of the jury is excessive. Finally, the award of attorney fees to Barnes must be reversed and remanded to the trial court to afford Barnes the opportunity to apply for fees under a recognized exception to the American Rule.

¶ 58 Accordingly, the Court of Civil Appeals' Opinion is **VACATED**; the trial court judgment on jury verdict is **AFFIRMED**; and the trial court judgment on attorney fees is **REVERSED** and **REMANDED** to the trial court for further proceedings.

17. We note our decision in this case is limited to UM/UIM lawsuits by insureds against their insurance companies, i.e. a situation where no statute or contractual provision allows for the recovery of attorney fees. *Compare Taylor v. State Farm*, 1999 OK 44, 981 P.2d 1253 [non-UM/UIM bad faith insurance case falling under 36 O.S.1991, § 3629(B)—where under tort-related theory of liability the core element of the damages sought and awarded is composed of the insured loss (i.e. the policy benefits) the reasonable attorney fees incurred for time spent preparing and prosecuting a bad faith claim **are** recoverable].

18. In that we reverse the trial court's attorney fee judgment and remand for further proceedings on the attorney fee issue, we need not rule on insurer's argument that the amount of attorney fees granted was excessive and unreasonable. For the same reason, we need not decide whether the COCA erred by failing to address the excessiveness/unreasonableness issue on the basis the attorney fee hearing transcript and Barnes' attorneys' time records were not included in the appellate record. We also note that a statute exists allowing for attorney fees in certain situations for litigation misconduct, 23 O.S.1991, § 103. *See Gorst v. Wagner*, 1993 OK 50, 865 P.2d 1227. The impact of § 103, if any, on the recoverability of attorney fees in this matter is not today reached by the Court.

¶ 59 SUMMERS, C.J., HODGES, KAUGER, WATT, BOUDREAU, and WINCHESTER, JJ., concur.

¶ 60 OPALA, J., dissents.

¶ 61 HARGRAVE, V.C.J., disqualified.

OPALA, J., dissenting.

¶ 1 The court *vacates* today the Court of Civil Appeals' opinion, *affirms* judgment on jury verdict for the insureds, but *snuffs out* the life of its common law declared in *Brashier*[1] and *invalidates* the counsel fee awarded in this cause. I dissent from the death warrant for *Brashier* and from the retrospective effect given its execution. *Brashier's* retrospective demise violates constitutionally anchored restrictions on the exercise of judicial power.[2] While there are other points of today's pronouncement to which I

1. *Brashier v. Farmers Ins. Co., Inc.*, 1996 OK 86, 925 P.2d 20.

2. Aside from the *constitutional infirmity* in the court's *retrospective abandonment* of *Brashier, supra* note 1, today's overruling of that pronouncement is both *unforeshadowed* and *sua sponte*. *Unforeshadowed*, because the court had given no *earlier* indication of its disenchantment; *sua sponte*, because the insurer-appellant *neither* argued for *Brashier's* decapitation *nor* even pressed that its authority be revisited. *Unforeshadowed changes* in jurisprudence have met with the U.S. Supreme Court's disapprobation. *See Chevron Oil Co. v. Huson*, 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971). There, the Court isolated three factors for ascertaining when retroactivity of a new pronouncement could be restricted. The **threshold factor** is that the decision must establish a new principle of law, whether by overruling clear past precedent on which litigants may have relied, or on an issue of first impression whose decision is not clearly *foreshadowed*. *Sua sponte changes* in decisional law, when effected without giving the parties an opportunity to submit advocacy instruments, have met with widespread condemnation in academic literature. Martin H. Redish, Carter G. Phillips, *Erie and the Rules of Decision Act: In Search of the Appropriate Dilemma*, 91 Harv. L.Rev. 356, 357 (1977). *See in this connection* the dissenting view of a state appellate court judge in *State v. Worrall*, 293 Mont. 439, 976 P.2d 968, 979–84 (1999)(Gray, J., concurring in part and dissenting in part). In the current U.S. Supreme Court practice, issues not urged in the petition for certiorari will not be considered *even*

do not accede, my message of dissent targets solely Part VI.

## I

## THE COURT'S CONDEMNATION OF *BRASHIER* AS DISHARMONIOUS WITH *CHRISTIAN* RESTS ON A FLAWED ANALYSIS

¶ 2 *Christian v. American Assur. Co.*[3] settled but one issue. It adopted the California view that a cause of action in tort will lie against an insurer for its bad-faith refusal to settle an insured's claim.[4] *The actionable quality of the described insurer's conduct is the sole Christian's ratio decidendi.*[5]

¶ 3 **The insured in *Christian* pressed for an attorney's fee as a common-law element of recovery.**[6] There, this court had

*if they were later briefed and argued. South Central Bell Tele. Co. v. Alabama*, 526 U.S. 160, 169–71, 119 S.Ct. 1180, 1186, 143 L.Ed.2d 258 (1999); *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 251–54, 119 S.Ct. 685, 686–87, 142 L.Ed.2d 648 (1999). **The litigants in this cause had not been afforded the opportunity to brief *Brashier's* continued vitality.**

3. 1977 OK 141, 577 P.2d 899, 901.

4. For the conceptual underpinnings of the insurer's bad-faith liability, *Christian* drew heavily, if not *exclusively*, from California jurisprudence. *See Gruenberg v. Aetna Insurance Co.*, 9 Cal.3d 566, 510 P.2d 1032, 1036 (1973), cited as the anchor of the *Christian* pronouncement. *Christian, supra* note 3 at 904.

5. For the definition of *ratio decidendi*, see *infra* note 12. **The new tort's elements of recovery were neither discussed nor settled in *Christian*. They were saved for explication by later-developed jurisprudence.**

6. The appellate briefs in *Christian* reveal that the insured sought recovery of attorney's fee as an element of damages. The insured/plaintiff states in his (21 December 1977) brief in chief (at page 3) that the insurer's refusal to pay the benefits "was a violation of [its] duty to deal fairly and in good faith" thereby causing him "great expense for additional medical expense, court costs, and attorney's fees." The insurer's (9 January 1976) answer and (25 August 1977) rehearing briefs state that plaintiff **claims as an item of damage** ... the attorney fee expended in [the] Garvin County case." (emphasis added).

two opportunities to decide whether an attorney's fee is recoverable as an item of damage or as a cost-shifting allowance [7] – first *on the appeal's submission* and then again *on rehearing*.[8] **The court instead left the issue unresolved until** *Brashier*. *Christian* merely suggested that the trial judge should on remand explore the possibility of counsel-fee allowance as costs.[9] Its statement on the subject is enigmatic at best. *It does not settle the issue. Brashier initially* **declares** Oklahoma's common law on counsel-fee recovery in a *Christian* claim.[10]

### A.

### *Christian's Suggestion For Postremand Exploration of Attorney's Fee Recovery Does Not Make Christian A Precedent Ignored By Brashier*

¶ 4 *Christian's* invitation that the nisi prius court explore on remand for an applicable exception to the American Rule [11] was not necessary to the declared *actionability* of the insured's claim. Because the court's statement in *Christian* did not decide the tendered counsel-fee issue, it can neither be deemed a part of the court's *ratio decidendi* [12] nor carry any precedential force.[13] The

---

7. The court in *Christian* could have either *rejected* or *adopted* the sought counsel-fee recovery by *distinguishing* the allowance of an attorney's fee as an **element of damages** from its award as **costs**. This distinction has been known to Oklahoma jurisprudence since at least 1917. In *United States Supply Co. v. Gillespie,* 1917 OK 249, 166 P. 139, 140, the court notes that because a counsel fee was awarded for the "prosecution of the present action" (for unlawful conversion of property), it was not *additionally* recoverable as "compensation for money properly expended in pursuit of the property." The court observes that the statute in contest there did not "contemplate recovery of attorney's fees as *compensatory damages,* or as *costs.*" (emphasis supplied). *See also Oliver's Sports Center, Inc. v. Nat'l Standard Ins. Co.,* 1980 OK 120, 615 P.2d 291, 296( Opala, J. concurring)(whenever in a common-law action triable to a jury counsel fee is sought as damages, the quantum to be allowed is a question of fact for the trier) (citing Kansas jurisprudence, *Missouri Pac. Ry. Co. v. Merrill,* 40 Kan. 404, 19 P. 793 (1888)).

8. The insurer's (27 August 1977) rehearing brief argues at page 28 that the court has "erroneously held that plaintiff's attorney fee expended in Garvin County ... may be recovered in the instant case." Another rehearing brief – that of an *amicus curiae – successfully* pressed for clarification of some other aspects of the opinion.

9. The sole text in *Christian, supra* note 3 at 906, that addresses itself directly to the insured's attorney's fee quest, is:

Appellant seeks recovery of the attorney fees he was forced to expend in the prosecution of his Garvin County action. Ordinarily, attorney fees may not be recovered in the absence of an agreement or statutory authority. *Globe & Republic Ins. Co. v. Independent Trucking Co.,* Okl., 387 P.2d 644 (1963). One exception to this rule is that where a litigant has acted in bad faith, wantonly or for an oppressive reason, the trial court, in exercise of its equitable power, may award attorney fees. *City National Bank & Trust Co. v. Owens,* Okl., 565 P.2d 4 (1977). Whether appellant comes within the exception of *City National Bank, supra,* will be a question for the trial court upon proper presentation of pleadings and proof.

10. For a discussion of the "declaratory theory" of common-law jurisprudence, see *infra* note 39 and the accompanying text.

11. The Court's opinion in *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141, 153–159 (1975), describes the American Rule in these words:

In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser. We are asked to fashion a far-reaching exception to this 'American Rule'; but having considered its origin and development, we are convinced that it would be inappropriate for the Judiciary, without legislative guidance, to reallocate the burdens of litigation....

In contrast to the American Rule, the English Rule calls for an across-the-board *postdecisional* cost- and counsel-fee shifting in favor of the victorious party. *Alyeska, supra,* 421 U.S. at 247, 95 S.Ct. at 1616.

12. A decision on an issue that is *not* before the court, much like arcane judicial observations on an issue twice-pressed but left unsettled by the court's opinion, cannot be paraded under the banner of *ratio decidendi. See Burch v. Allstate Insurance Co.,* 1998 OK 129, ¶ 12, 977 P.2d 1057, 1062–63 (where the court refused to recognize as *ratio decidendi* a gratuitous comment in an earlier opinion on an issue that was not before the deciding court). In both of the described instances missing is the critical component of a *binding pronouncement.* **That *sine qua non* component is supplied in the common-law tradition by a *judicially settled issue of law that the case at bar presented for required resolution.*** "[T]he only part of a previous case which is binding is the *ratio decidendi* (reason for deciding)." Rupert Cross, Precedent in English Law 33, 34, 35, 37–38, 61–62,77 (1961).

13. See *Cohens v. Virginia,* 19 U.S. (6 Wheat) 264, 399, 5 L.Ed. 257 (1821), for Chief Justice Marshall's admonition about the weakness of dicta produced by inadequate efforts in its formulation:

*Christian* hint about postremand inquiry is at most *obiter dictum*.[14] As one textwriter observes, when a court "wishes to avoid the hard labor of law creation, it may take the easy route of applying a dictum as if it were an authoritative, governing rule."[15]

## B.

### *Brashier's Teachings*

¶ 5 *Brashier* resolved the issue *tendered* (but left undecided) in *Christian* by sanctioning counsel-fee recovery as *an element of plaintiff's damage in a UM (uninsured motorist) coverage bad-faith dispute.* The court observed that "*Christian*, which shaped our common law of [bad-faith] tort,[16] made counsel fees an element of the insured's damage recovery for insurer's bad-faith refusal to pay the claim."[17] *Brashier's* quoted reference was in recognition of *Christian's* unequivocal reliance on California jurisprudence *as a model for the new Oklahoma claim in tort.*[18] *Brashier* is entirely consistent with and obediently follows the California cases on the

subject. According to California caselaw, when a bad-faith breach occurs, the insurer is "liable for any damages which are the proximate result of that breach."[19] *California's Brandt v. Superior Court*[20] *clearly teaches that counsel fee is an element of insured's common-law damages in an action for vindication of an insurer's bad-faith refusal to settle.* There, the court unequivocally held:

> When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an *economic loss – damages – proximately caused by the tort* .... These fees must be distinguished from recovery of attorney's fees qua attorney's fees, such as those attributable to the bringing of the bad faith action itself.[21]

(emphasis added).

¶ 6 *Brashier* has stayed true to the course charted by California jurisprudence and

---

"It is a maxim not to be disregarded that general expression, in every opinion, are to be taken in connection with the case in which those expressions are used.... The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it ... [are] seldom completely investigated."

14. In The American Common Law Method [1997] § 2.18 at page 19, Professor Richard B. Cappalli, describes the nonbinding nature of dicta:

First year texts describe dicta as comprising a legal proposition stated in an opinion but involving facts not before the court; such pronouncements have only "persuasive force according to an imprecise scale of weightiness. Because the precedent-issuing court has stepped beyond the bounds of its authority when it speaks law not essential to resolving the parties' dispute, its successor courts are free to dismiss such talk as nonbinding. This implies that some other talk within the opinion *is* binding, but we already know that all verbiage in the precedent can be freely ignored by the precedent's users."

(emphasis in text; citations omitted).

15. *Cappalli, supra* note 14, § 3.05(g) at 26.

16. By statutory mandate this court is authorized to craft the norms of common law. 12 O.S.1991 § 2.

17. *Brashier, supra* note 1 at 24.

18. *See supra* note 4.

19. *Neal v. Farmers Ins. Exchange,* 21 Cal.3d 910, 148 Cal.Rptr. 389, 582 P.2d 980, 988 (1978).

20. 210 Cal.Rptr. 211, 37 Cal.3d 813, 693 P.2d 796, 798 (Cal.1985). *See also Helfand v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 10 Cal.App.4th 869, 907, 13 Cal.Rptr.2d 295, 317 (1992); *White v. Western Title Ins. Co.,* 221 Cal. Rptr. 509, 520, 40 Cal.3d 870, 890, 710 P.2d 309, 320 (1986); *Filasky v. Preferred Risk Mut. Ins. Co.,* 152 Ariz. 591, 734 P.2d 76, 82–83 (1987) (the court affirmed a jury award of compensatory damages for emotional distress *and attorney's fee caused by insurer's bad faith,* holding that "[d]amages for pain, humiliation, or inconvenience, as well as pecuniary losses *for expenses such as attorney's fees,* trigger an invasion of protected property rights" (emphasis supplied)); *Motorists Mut. Ins. Co. v. Brandenburg,* 72 Ohio St.3d 157, 648 N.E.2d 488, 489 (1995) ("an insured may be entitled to attorney fees when an insurer wrongfully refuses to defend an insured in a negligence action"); *DeChant v. Monarch Life Ins. Co.,* 200 Wis.2d 559, 547 N.W.2d 592, 599 (1996) ("attorney's fees ... are recoverable by a prevailing party in a first-party bad faith action as ... compensatory damages resulting from the insurer's bad faith").

21. *Brandt, supra* note 20 at 798 (citations omitted).

hence followed the *Christian's ratio deciden-di.* That state's teachings, which authorize an attorney's fee in a claim for bad-faith refusal to settle, are based on the notion that *an attorney's fee is a common-law element of loss to the plaintiff and should hence be part of the plaintiff's recoverable damages.* The *Brashier* dissent by a justice who authored *Christian was no more than that justice's untimely personal disapprobation of the later jurisprudential development.*[22] Today's opinion, *which appears to begin and end its analysis with Christian,* **utterly ignores** *Christian's genesis in California's common-law jurisprudence* and the *subsequent growth of that state's common law in absolute consistency with the teachings of Brashier.*

¶ 7 *Brashier* should not be condemned for failure to follow *Christian.* **The latter did not resolve the-there tendered issue of whether an attorney's fee is recoverable as damages.** *Christian's* theory, patterned after California's jurisprudence, logically led to *Brashier's* adoption of the notion that an attorney's fee element of the plaintiff's demand may be submitted to the triers as an issue of damages on the merits of the insured's claim. There is hence absolutely no jurisprudential warrant for condemning today *Brashier's* "departure" from *Christian.*

## II

### THE COURT'S CONDEMNATION OF *BRASHIER* AS VIOLATIVE OF THE *AMERICAN RULE* RESTS ON ITS DISTORTED VIEW OF THE RULE

¶ 8 The quintessence of the American Rule, expressed in *Alyeska Pipeline Service Co. v. Wilderness Society,*[23] is that, in the absence of contract or statute, the victor cannot recover against the vanquished party a post-judgment allowance of incurred legal fees.[24] The American Rule strikes at the English concept of shifting terminated litigation's costs from the victorious party-bearer to that party's vanquished opponent.[25] *It neither deals with nor affects recovery of counsel fee as **an element of damage** to the plaintiff – an issue on the merits of the aggrieved party's claim.* Rather, the American Rule targets *postjudgment issues,* **not issues on the merits** – *i.e.,* those which affect one or more elements of the claim for relief (or of the defense).[26]

¶ 9 *Brashier* **does not** authorize *post-judgment assessment of costs* against the vanquished party. It merely views the *ex-penses* of an attorney's fee as a necessary element of damage in the process of vindicating the insurer's breach of an implied-in-law covenant to settle the insured's claim in good

---

22. *See Brashier, supra* note 1 at 27–28 (Simms, J., concurring in part, dissenting in part).

23. *Alyeska, supra* note 11, 421 U.S. at 247, 95 S.Ct. at 1621–1622, 1627 (the Court explains the historical antecedents of the American Rule). Since *Arcambel v. Wiseman,* 3 U.S. 306, 3 Dall. 306, 1 L.Ed. 613 (1796) the Court has recognized that, unless authorized by statute or contract, "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska,* 421 U.S. at 247, 95 S.Ct. at 1616. *See* Nussbaum, *Attorney's Fees in Public Interest Litigation,* 48 N.Y.U.L.Rev. 301, 312–13 (1973).

24. *Alyeska, supra* note 11, 421 U.S. at 257, 95 S.Ct. 1612. There, the Court reaffirmed its commitment to certain narrowly-defined common-law exceptions to the rule. Those recognized exceptions are: (1) when the litigant preserves or recovers a fund for the benefit of others; (2) *when a losing party acts in bad faith, vexatiously, wantonly, or for oppressive reasons ;* or (3) when a defendant wilfully disobeys a court order.

*Alyeska supra* note 11, 421 U.S. at 247–54, 95 S.Ct. at 1616–20. *See also Moses v. Hoebel,* 1982 OK 26, 646 P.2d 601, 603.

25. *Alyeska, supra* note 11, 421 U.S. at 247–54, 95 S.Ct. at 1616–20. The English practice of awarding fees dates for some actions to the time anterior to the Statute of Gloucester in 1275. Charles T. McCormick, *Counsel Fees and Other Expenses of Litigation as an Element of Damages,* 15 Minn. L.Rev. 619, 619 (1931).

26. What is *on or dehors the merits* depends on whether the issue at hand affects one or more elements of the claim for relief or any elements of the defense that stand interposed against the claim. *Hadnot v. Shaw,* 1992 OK 21, 826 P.2d 978, 985 n. 25. The word "merits" has a well-defined meaning in law. *See, e.g., Shamblin v. Beasley,* 1998 OK 88, 967 P.2d 1200, 1206; *Ellison v. Ellison,* 1996 OK 64, ¶5, 919 P.2d 1, 2; *Pierson v. Canupp,* 1988 OK 47, 754 P.2d 548, 552 n. 8; *Pryse Monument Company v. District Court of Kay County,* 1979 OK 71, 595 P.2d 435, 437–38.

faith.[27] The inclusion of that harm among the damage elements rests on the notion that the tort of bad-faith refusal to settle proximately produces litigation expenses to the insured's detriment. That litigation expense is a *legitimate* and *immediate* consequence of the actor's failure to deal fairly. A legitimate tort element of damage is that which is proximately caused by the tortfeasor's act.[28] The *Brashier*-authorized recovery for legal expense in a *Christian* tort is confined to that which grows out of bad-faith refusal to settle; it is *not to be granted for winning the lawsuit.*

¶ 10 Today's flawed result stems from the court's *crude analysis* which in turn leads to its conclusion that in no UM/UIM tort litigation a counsel-fee may be recovered without violating the American Rule. In light of *Alyeska's* teachings, *Brashier* reaches a result that stays clear of running on a collision course with the American Rule.

### Today's Pronouncement Singles Out One Subclass of Tort For Uneven Application of the American Rule

¶ 11 The court's approach to *its jurisprudential change* creates caselaw that is *not evenhanded.* Its pronouncement violates the law's symmetry because Oklahoma recognizes tort cases – *i.e.,* malicious prosecution [29] – in which litigation expense constitutes an element of recoverable damage.

### III

### THE PLAINTIFFS ARE WITHIN THE RANGE OF PROTECTIONS AFFORDED BY ART. 5 §§ 52, 54, OKL.CONST.

### A.

### *The Mandate of Art. 5 §§ 52, 54, Okl.Const.*

¶ 12 Substantive rights may not be changed for application to a claim or defense in a *pending* judicial proceeding. Art. 5 § 52, Okl.Const.[30] A *proceeding begun* under applicable norms of substantive statutory law (or common law) then in force remains unaffected by after-enacted legislative changes (or those effected through the process of judicature). Art. 5 § 54, Okl.Const.[31] The interests protected under these constitutional provisions are deemed "accrued rights." An accrued right within the meaning of § 54 is a "matured cause of action or legal authority to demand redress." [32] Once it has been created and has become absolute,

27. *Brashier, supra* note 1 at 24.

28. *See in this connection* the court's rationale in *Security State Bank of Comanche v. W.R. Johnston & Co.,* 1951 OK 40, 228 P.2d 169, 173, for making an attorney's fee expense an element of damages in a malicious prosecution case. Quoting with approval from (*McGaw v. Acker, etc., Co.,* 111 Md. 153, 73 A. 731, 734), the court stated:

> [W]here the wrongful acts of the defendant have involved the plaintiff in litigation with others, or placed him in such relations with others as make it necessary to incur expense to protect his interest, such costs and expense should be *treated as legal consequences of the original wrongful act.*
> (emphasis added).

29. *See Security State Bank, supra* note 28 at 173; (*First Nat. Bank of Taloga v. Salisbury,* 1930 OK 10, 292 P. 1113); *Hertzel v. Weber,* 1926 OK 318, 246 P. 839, 841.

30. The terms of Art. 5, § 52, Okl.Const. are:
> The Legislature shall have no power to revive any right or remedy which may have become barred by lapse of time, or by any statute of this State. *After suit has been commenced on any cause of action, the Legislature shall have no power to take away such cause of action, or destroy any existing defense to such suit.*
> (emphasis added).

31. The terms of Art. 5 § 54, Okl.Const., are:
> The *repeal of a statute* shall not revive a statute previously repealed by such statute, *nor shall such repeal affect any accrued right,* or penalty incurred, *or proceedings begun* by virtue of such repealed statute.
> (emphasis added).
> *See First Nat. Bank of Pauls Valley v. Crudup,* 1982 OK 132, 656 P.2d 914, 916–917. There, the court dealt with an enactment that operated to abridge a limitation period governing foreclosure of certain mechanic's or materialmen's liens. A lien statement timely filed pursuant to a then-existing statute was held to constitute a "proceeding begun" whose limitation could not be shortened by an after-enacted statute without offending Art. 5 § 54, Okl.Const.

32. *In re Ross,* 1949 OK 132 ¶ 8, 207 P.2d 254, 256; *Barry v. Board of County Com'rs of Tulsa County,* 1935 OK 701, 49 P.2d 548, 550; *Morley v. Hurst,* 1935 OK 712, 49 P.2d 546, 546.

it is protected from legislative *or judicial invasion* by Art. 5, §§ 52 and 54, Okl. Const.[33] Although these sections' commands are directed to the legislature, they are no less binding on the courts. Our own jurisprudence, no less than the legislature's enactments, must faithfully conform to the fundamental law's mandate. **The judiciary is without a fundamental-law license to destroy accrued rights.**[34] Like the legislature, the courts must respect the protection that surrounds the interests shielded by the Constitution. No judicially sponsored common-law developments can lay claim to immunity from constitutional restraints on lawmaking activity that destroys accrued rights.

## B.

### The Teachings of *Thomas v. Cumberland Operating Co.*[35]

¶ 13 *Thomas* teaches that a statutory increase in the quantum of damage recoverable

in contract fashions "a new element of damages as distinguished from [creating] a new remedy. . . ." Legislative increases (or decreases) in the common-law measure of damage are changes in substantive rights which should be applied prospectively only.[36] Claims that have accrued before the law is changed are protected from legislative or judicial invasion.[37]

## C.

### Brashier Had Full Retrospective Sweep

¶ 14 *Brashier,* as the court concedes, is the ruling *common-law declaration* on the issue of attorney's fee as an element of damages in an action to recover upon a *Christian* tort. *It is the governing common law for both parties* – the *Christian* plaintiff *in this cause* as well as the defending insurer.[38] Under the Blackstonian notion of "declaratory theory," [39] the common law exists independently

33. *Smith v. Smith,* 1982 OK 115, ¶ 1, 652 P.2d 297, 299 n. 1 (Opala, J., concurring); *Oklahoma Water Resources Bd. v. Central Okl. M.C. Dist.,* 1968 OK 73, ¶ 23, 464 P.2d 748, 755. The repeal of a statute shall not affect any right accrued by virtue of the repealed statute. *Baker v. Tulsa Building & Loan Ass'n,* 1936 OK 568, 66 P.2d 45, 49.

34. The protection of Art. 5, §§ 52 and 54, Okl. Const., *supra* notes 30 and 31, *must extend with equal vigor to accrued rights derived from the common law.* Common-law rights cannot be singled out under Art. 5, § 46, Okl.Const., for a treatment different from that which is accorded other rights. The Constitution provides no authority for distinguishing one accrued right from another by the source of law from which it is derived. ·

35. 1977 OK 164, 569 P.2d 974. For *Thomas'* progeny see *Roach v. Jimmy D. Enterprises, Ltd.,* 1996 OK 26, 912 P.2d 852 ; *Majors v. Good,* 1992 OK 76, 832 P.2d 420 (statutory increases or restrictions on recoverable damages are changes in substantive rights that must be applied prospectively only).

36. The issue in *Thomas* was whether the statutory increase in wrongful death benefits should be applied retroactively. This court held that "[s]tatutory increases in damage limitations are changes in substantive rights and not mere remedial changes." *Thomas, supra* note 35 at 976.

37. Art. 5, § 54, Okl.Const., *supra* note 31. Rights are established in the states by their con-

stitution, statutes or the common law. *Oklahoma Water Res. Bd., supra* note 33 at 755; *Smith, supra* note 33 at 299 n.1 (Opala, J., concurring). "[A] vested cause of action, whether emanating from contract or common-law principles, may constitute property beyond the power of the legislature to take away . . . ." *de Rodulfa v. United States,* 461 F.2d 1240, 1257 n. 96 (D.C.Cir.1972), *cert. denied,* 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972).

38. *Brashier has fully retrospective force.* That impact is ascribed to every common-law decision unless a different effect is explicitly stated in its text. ·

39. *See Linkletter v. Walker,* 381 U.S. 618, 623, 85 S.Ct. 1731, 1733–34, 14 L.Ed.2d 601 (1965) (under the declaratory theory, "rather than being the creator of the law [the judge] was but its discoverer"); *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 549, 111 S.Ct. 2439, 2451, 115 L.Ed.2d 481 (1991) (Scalia, J., concurring) (judges make law "as though they were 'finding' it– discerning what the law is, rather than decreeing what it is today changed to, or what it will tomorrow be"). The declaratory theory is described in Blackstone's maxim to mean that the duty of the court is not to "pronounce a new law, but to maintain and expound the old one." 1 Blackstone, Commentaries 69 (15th ed. 1809). *Linkletter, supra,* 381 U.S. at 622–23, 85 S.Ct. at 1734. "Although the view that judges discover rather than create the law is generally attributed to Blackstone, a similar view was expressed by Sir Matthew Hale 13 years before Blackstone was born." Jill E. Fisch, *The Vanishing Prece-*

of judicial decisions and a court's function is to *"discover"* this absolute law. Once it has been found, the court's pronouncement of the declared common law has *a fully retrospective force* [40] unless its opinion explicitly states otherwise.[41] There was no pre-*Brashier* law (statute or common law) which proscribed a *Christian* plaintiff from recovering an attorney's fee expense as an *element of recovery* in a tort for bad-faith refusal to settle. *Brashier* did not change pre-existing common law. Rather, it "discovered" *the law ignored by Christian in its decisional and rehearing stages.*

¶ 15 Because *Brashier* applied retrospectively to the date this cause of action arose and was the law that governed tort liability for UM coverage at the time the claim was reached for trial, the insured, under the teachings of *Thomas,* is clearly entitled to the application of that pre-existing norm of substantive law. Today's retrospective death warrant for *Brashier* violates the constitutionally anchored restrictions on the exercise of lawmaking activity by *both* legislative and judicial organs of government.

> dent: *Eduardo Meets Vacatur,* 70 Notre Dame L.Rev. 325, 367 n. 44 (1994). *See* Matthew Hale, THE HISTORY OF THE COMMON LAW OF ENGLAND 45 (The University of Chicago Press 1971) (1713); Harold J. Berman, Charles J. Reid, Jr., *The Transformation of English Legal Science: From Hale to Blackstone,"* 45 Emory Law Journal 437, 448 (1996); *Cross, supra* note 12 at 21–30 (Ch. 1, sub. div. 7, *The declaratory theory of precedent).*

40. *"... *[W]hen there is a precedent, orthodox theory has ceased to maintain that the precedent is no more than evidence of the moral fitness, public convenience, or conformity to usage of a rule derived from a previous decision or series of decisions. *Such a rule is law* 'properly so called' and law because it was made by the judges, not because it originated in common usage, or the judges' idea of justice and public convenience. Holdsworth once wrote in a manner suggesting that the views of Hale and Blackstone [on the retrospective effect of common-law jurisprudence] represent twentieth-century judicial doctrine...."* Cross, supra* note 12 at 22 (emphasis supplied).

41. The retrospective application of decisions is grounded on the view that "the function of the courts [is] to decide cases before them based upon their best current understanding of the law", a view that in turn reflects the declaratory theory of the law, according to which the courts are understood only to find the law, not to make

## IV

## SUMMARY

¶ 16 *Brashier* is consistent with *Christian's ratio decidendi* and hence with its precedential force. It is also in harmony with the *Christian* tort's model in California's common-law jurisprudence. Recovery of attorney's fee as an element of damages is a legitimate consequence of the insurer's harm-dealing process. It is an economic detriment to the insured *proximately occasioned* by the insurer's refusal to enter into good-faith settlement.

¶ 17 The court *stretches the American Rule* far beyond the outer limits of its common-law boundary and, without any warrant, *elevates* that norm of unwritten law to a constitutional fetish.[42] Today's retrospective application of the court's departure from *Brashier* violates Art. 5, §§ 52 and 54, Okl. Const. The common law is not exempt from constitutional testing. Like legislation, it must pass the fundamental law's muster.[43]

it. *Beam, supra* note 39, 501 U.S. at 535–36, 111 S.Ct. at 2443.

42. The "American Rule" *does not have a constitutional dimension* in the state-court systems. It is but a self-imposed restraint on the exercise of judicial power in shifting litigation costs. *See Reynolds v. First Alabama Bank of Montgomery,* 471 So.2d 1238, 1241 (Ala.1985); *Fleming v. Garnett,* 231 Conn. 77, 646 A.2d 1308, 1317 (1994); *Goodrich v. E.F. Hutton Group, Inc.,* Del.Supr., 681 A.2d 1039, 1043–44 (1996); *Dalo v. Kivitz,* 596 A.2d 35, 37, 39 (D.C.1991); *Oliver T. Carr Co. v. United Techs. Communications Co.,* 604 A.2d 881, 883 (D.C.1992); *Sheridan v. Greenberg,* 391 So.2d 234, 236 (Fla.App.1980) ("The fundamental rule in Florida is that attorneys' fees are in derogation of the common law and will only be granted pursuant to a contractual agreement or statutory authority"); *State Farm Fire & Casualty Co. v. Miller Electric Co.,* 231 Ill.App.3d 355, 359, 172 Ill.Dec. 890, 596 N.E.2d 169 (1992); *Board of Comm'rs v. Wyant,* 672 N.E.2d 77, 79 (Ind.Ct.App.1996); *Dodge v. United Services Auto. Ass'n,* 417 A.2d 969, 975 (Me.1980); *Waldman v. American Honda Motor Co.,* 413 Mass. 320, 322, 597 N.E.2d 404, 406 (1992); *Popma v. Auto Club Ins. Ass'n,* 446 Mich. 460, 474, 521 N.W.2d 831, 837 (1994).

43. *See Sniadach v. Family Finance Corp.,* 395 U.S. 337, 340, 89 S.Ct. 1820, 1822, 23 L.Ed.2d 349 (1969) (where the Court says, "The fact that a procedure would pass muster under a feudal

Inasmuch as retrospective effect that is given today's pronouncement destroys rights protected by §§ 52 and 54, *I would hold that the change in substantive norms of the state's common law* cannot be applied to claims "accrued" and "proceedings begun" *before* the date mandate in this case will have issued.

¶ 18 Aside from distorting the American Rule, today's pronouncement magically transmogrifies the *lifeless ashes* of one justice's post-*Christian* dissent from his mere afterthought into a *viable core ingredient* of *Christian's ratio decidendi.* A remarkable display of judicial prestidigitation!

### ¶ 19 *An Ode to the Short Life of Brashier: May it Rest in Peace!*

¶ 20 Changed minds – not flawed jurisprudence – deal *Brashier* the lethal blow that ends its life today. The rejected authority's doctrinal soundness will not save it from extinction. The core message of *Brashier* – plainly apparent but conveniently ignored until now – lacks appeal to those legal minds that remain *stubbornly averse* to letting lay triers set the value of lawyer services. *Brashier's demise* is driven by this passion. Because I do not share it, I would remain faithful to *stare decisis* and remand this cause for jury assessment of the attorney's fee that one may recover *as an element of legal damages* in an action for an insurer's *Christian* tort.[44] The solution I propose is vastly superior to that chosen by the court. The latter sends the suit back for an exploration of uncharted seas, filled with waters known to be inhospitable to the court-sponsored fishing expedition. Handed to the victor by today's disposition is a postremand license to search for some statute which would authorize one who prevailed in tort to seek a postjudgment counsel-fee award against the vanquished enemy. Invited to come along for the fantasy ride is the nisi prius judge; but in today's zigzag jurisprudence no roadmap is provided to a safe harbor for either party – the insured or the insurer. Happy hunting, ladies and gentlemen!

---

regime does not mean it gives necessary protection to all property in its modern forms"); *Shaffer v. Heitner*, 433 U.S. 186, 212, 97 S.Ct. 2569, 2584, 53 L.Ed.2d 683 (1977) (where it is said, " '[T]raditional notions of fair play and substantial justice' *can be as readily offended by the perpetuation of ancient forms that are no longer justified as by the adoption of new procedures that are inconsistent with the basic values of our constitutional heritage"* (emphasis mine)).

44. A reviewing court may direct that on remand the nisi prius court conduct a jury trial of less than all the issues on the merits of the claim. *Hallford v. Schumacher*, 1958 OK 53, 323 P.2d 989, 993.