2010 OK CIV APP 99

**George Allen BEERS, Plaintiff/Appellant,**

v.

**Dorothy HILLORY, Defendant,**

and

**Northland Insurance Company, a Minnesota corporation, Defendant/Appellee.**

**No. 107,411.**

Court of Civil Appeals of Oklahoma, Division No. 2.

Sept. 9, 2010.

Michael Green, Tulsa, OK, for Plaintiff/Appellant.

D. Lynn Babb, Oklahoma City, OK, for Defendants/Appellees.

JOHN F. FISCHER, Presiding Judge.

¶1 George Allen Beers appeals the district court's order granting his automobile insurance carrier Northland Insurance Company's motion for summary judgment. Beers sued NIC, claiming that NIC breached the insurance contract and its duty of good faith and fair dealing by unreasonably delaying payment of his claim for uninsured motorist (UM) benefits.[1] Although the district

---

1. "Generally, an implied duty of an insurer to act in good faith and deal fairly with its insured is imposed by law upon the insurer-insured relationship, and a breach of that duty arises from a breach of the insurance contract where the breach occurs in a manner constituting a lack of good faith; i.e., constituting bad faith." *Brown v. Patel*, 2007 OK 16, ¶9, 157 P.3d 117 (citing *Christian v. American Home Assurance Co.*, 1977 OK 141, 577 P.2d 899). For convenience, we

court correctly disposed of some aspects of Beers's claim, we find that disputed issues of material fact exist with respect to other aspects of that claim, precluding summary judgment.

## BACKGROUND

### I. Pre–Litigation

¶ 2 On March 6, 2006, Beers was involved in an automobile accident with defendant Dorothy Hillory. Beers sustained injuries in the accident and subsequently underwent back surgery. On April 13, 2006, attorney Michael Green sent a letter to NIC advising that he had been retained by Beers to pursue recovery for his injuries as a result of the accident. Green requested certain information regarding UM coverage and NIC's investigation of the accident. The letter also advised: "This office has been assigned a portion of any recovery for professional services rendered."

¶ 3 On April 17, 2006, NIC issued a $5,000 check, the policy limit for Beers's medical benefit coverage. The check was made payable to Beers and Green. Neither objected. On or about May 11, 2006, NIC assigned the Beers claim to its adjuster Jacqueline Adamson, who worked in NIC's office in St. Paul, Minnesota. In reviewing the claim file to date, Adamson noted that there did not appear to be a complete set of Beers's medical bills and medical records. She also noted that Beers had suffered from a back condition that pre-existed the accident. On May 31, 2006, Adamson asked Green to provide a signed medical authorization from Beers so that she could obtain records from Beers's primary care physician and a more complete set of records of his post-accident medical treatment.

¶ 4 By letter dated October 31, 2006, Green advised Adamson that Hillory's insurance carrier had offered Beers the $50,000 liability limit of Hillory's policy. In this letter, Green referred Adamson to 36 O.S. Supp.2004 § 3636, which provides that a UM insurer, on receipt of its insured's notice of settlement with the tortfeasor, has 60 days to either substitute its payment for that of the liability insurer or waive its subrogation rights.[2] When Adamson received this letter from Green on November 9, she had documented medical expenses in her file of approximately $10,000.

¶ 5 Adamson contacted Green's office by telephone to request a copy of the declarations page of Hillory's insurance policy to verify her liability limit. In that conversation, she also repeated her request for the signed medical authorization and medical provider information. Adamson testified at her deposition that, during the phone call on November 3, 2006, Green's legal assistant had assured her that she would be sending the tender letter, the results of the asset check on Hillory, and "the information I had been requesting since May of 2006 with medical authorizations and medical providers listed so that I could obtain all of the information to fully evaluate Mr. Beers's injury and condition prior to the March 1, 2006 accident and verify what injuries he has sustained as a result of [that] accident."[3]

¶ 6 On November 7, 2006, Adamson received a copy of an asset check on Hillory sent by fax from Green's legal assistant. On December 15, Adamson received the liability limit verification by fax, and on December 19, Green's legal assistant faxed Adamson an updated summary of medical expenses incurred by Beers. On the following day, December 20, 2006, Adamson wrote to Green: "Please be advised that we will not be substituting payment and we waive subrogation rights against Mrs. Hillory. Kindly provide me with the previously requested information so we can evaluate your client's claim."

will refer to NIC's alleged breach of duty as Beers's "bad faith" claim.

2. Section 3636(F) further provides that "if a tentative agreement to settle for liability limits has been reached with an insured tort-feasor, written notice shall be given by certified mail to the uninsured motorist coverage insurer by its insured. Such written notice shall include: (1) Written documentation of pecuniary losses incurred, including copies of all medical bills; and (2) Written authorization or a court order to obtain reports from all employers and medical providers."

3. The record on appeal does not contain a medical authorization form signed by Beers.

¶ 7 In his October 2006 letter notifying Adamson of the offer of the tortfeasor's liability limit, Green stated that he previously had supplied Adamson with a signed medical authorization. The record indicates that Green had delegated this task, along with several others, to his legal assistant. Beers would later state in an affidavit, however, that "NIC did not send to me a medical authorization to sign."

¶ 8 Green's legal assistant wrote a letter to Adamson on January 31, 2007, wherein she stated:

> I have previously forwarded to you medical bills and records for the treatment received by George for the injuries in [*sic*] sustained in the accident. . . . His medical bills are in excess of $100,000.00, the total coverage available. . . . Please advise as to the status of your completion of the evaluation of George's UM claim.

In a letter dated March 8, 2007, attorney Green advised Adamson that Beers had been released from treatment by his surgeon. Green requested that Adamson contact his legal assistant regarding completion of NIC's investigation of Beers's UM claim. In his next letter to Adamson on April 16, Green requested that she contact the legal assistant within the next week or "we will otherwise be forced to file a Petition for bad faith against [NIC] due to your lack of communication."

¶ 9 Although Adamson still had not received all of the medical information she requested to fully evaluate the UM claim, and/or a signed authorization to obtain Beers's medical records, she made what she described as a "business decision" to give Beers "the benefit of the doubt" that all of his $100,000 medical expense claim resulted from the automobile accident. Adamson determined, on March 9, 2007, that it would be "a prudent course of action" to extend the UM policy limits to Beers. Before communicating the offer to Green, Adamson contacted NIC's counsel for advice regarding handling of medical liens and seeking a release from Beers. While awaiting response from NIC's counsel, Adamson continued her work on other aspects of Beers's accident claim including speaking with the liability carrier's adjuster regarding the incomplete documentation of Beers's commercial vehicle "downtime" loss.

¶ 10 In a letter dated May 18, 2007, Adamson sent a letter to attorney Green, offering to settle, for the $50,000 policy limit, "any and all UIM claims, including all liens and subrogation interests." Included with the letter was a document entitled "Release and Defense, Indemnity and Hold Harmless Agreement" (Release) to be signed by both Beers and Green. Regarding the Release, Adamson wrote to Green:

> If your client is agreeable to this settlement, a draft release is enclosed. Please have the release properly executed (dated, signed and notarized) and return the original release to me along with your firm's tax identification information. Upon receipt of the original release, I will issue the settlement draft.

¶ 11 The Release generated further correspondence between Adamson and Green. On May 21, 2007, Green responded advising Adamson: "I will not agree to sign the release and indemnity agreement. Please forward a Release of All Claims to my office for George's [Beers's] signature only." Adamson's reply, dated June 12, 2007, acknowledged Green's refusal to sign the Release. Adamson instead requested "documentation establishing that all of the medical providers' liens have been satisfied and released."

¶ 12 In a letter dated June 15, 2007, attorney Green advised Adamson: "The medical providers have not been paid. Please list as payees George Beers, Michael R. Green (my tax ID # is . . .) and all lienholders on the check for your policy limits and forward to our office with the release of all claims immediately." On June 20, Green sent a letter "Via Fax" to Adamson, again requesting a release that did not require his signature. Green concluded this letter by stating: "If I do not receive the new Release by June 27, 2007, then we will pursue all available legal remedies." Adamson's response to Green, sent "Via Fax" on July 2, included the following:

> We previously requested information about lienholders. I refer you to our prior requests to provide:

A list of medical providers (name and address) who provided treatment to claimant for the accident.

A copy of all bills for claimant's medical care and expenses.

An accounting of all payments made to or on behalf of claimant for medical, wage or any other expenses incurred relating to the accident, including the amount paid, the name and address of the party making payment, the name and address of the party to whom payment was made.

This information has still not been provided.

Please either provide the above information; or a list of each medical provider which provided treatment to Mr. Beers for which bills are unpaid and/or liens exist.[4]

¶ 13 On the same day that he received Adamson's faxed request, Green replied to Adamson, repeating that "the lienholders have not been paid." Green again requested a check made payable to Beers and himself, as counsel, but this time he specified five medical providers to be added as payees on the check.

¶ 14 On July 11, 2007, Adamson sent a revised release and hold harmless document to Green that did not require his signature but only that of Beers. Green did not return this release. On August 3, Adamson sent Green a duplicate copy of the revised release. Green did not return this document, and five days later, on August 8, 2007, he filed suit on behalf of Beers seeking recovery from both Hillory and NIC.[5]

## II. The District Court Proceedings

¶ 15 In his action against NIC, Beers alleged that NIC breached the insurance contract and breached the duty of good faith and fair dealing by unreasonably delaying the evaluation and payment of his UM claim. NIC asserted that it had satisfied its contractual obligations to Beers and that it had acted fairly and dealt with him in good faith.

¶ 16 NIC filed a motion seeking leave to file a third-party interpleader petition, to which Beers responded that he had no objection. NIC's interpleader petition included third-party defendant medical care providers McAlester Regional Health Center, the Orthopedic Center, Orthopaedic Pain Management, HealthSouth, Hillcrest Medical Center, Saffa Compounding Pharmacy, Walgreens, The Rogers Clinics and Southeastern Radiology, P.C. NIC paid its $50,000 UM policy limit with the filing of its petition. In his answer to the interpleader petition, Beers admitted that the third-party defendants had provided him treatment and services for the injuries he sustained in the accident. He joined in NIC's request that the district court identify all potential claimants to the UM benefits and determine the validity of their claims. Five of the nine medical providers claimed liens against the interpleaded funds. Following a pre-trial hearing, the district court dismissed "certain claims of third-party defendants."[6] On July 10, 2008, Beers and the remaining lien claimants settled the issues among them. The district court approved the settlement and subsequently distributed these amounts: $31,077 from the interpleader fund to Beers and counsel Green, $18,623 to the Orthopaedic Center and Orthopedic Pain Management and $300 to the court clerk as poundage.

¶ 17 NIC then filed a motion for summary judgment as to Beers's breach of contract and bad faith claims, to which Beers objected. The parties attached voluminous evidentiary materials to their supporting briefs. The district court set NIC's motion for oral argument, during which the issues for con-

---

**4.** As noted above, Adamson made her first request that Green provide this information, in addition to other documentation, on or about May 31, 2006, to assist her in evaluating Beers's UM claim.

**5.** Beers dismissed Hillory from the action with prejudice on October 22, 2008. She is not a party to this appeal.

**6.** The actual interpleader documents are not included in the assembled record, but some details regarding the interpleader are provided in the parties' summary judgment materials. The district court also discussed the interpleader proceedings with the parties at the summary judgment hearing, and set forth details of the interpleader in the order granting summary judgment to NIC.

sideration were narrowed as a result of attorney Green's admission, during questioning by the district court, that NIC's actions prior to March 9, 2007, were reasonable and did not constitute the basis for his allegations of bad faith.[7]

¶ 18 On July 20, 2009, the district court, finding no issues of material fact in controversy, entered its order granting judgment in favor of NIC. The 10–page order details the district court's rationale for these conclusions: (1) NIC complied with and satisfied its contractual obligation to investigate, evaluate, and pay Beers's UM claim; (2) NIC's actions were reasonable under the circumstances; (3) NIC dealt fairly and in good faith with Beers; and (4) no unjustified delay in payment was attributable to NIC. Beers appeals.

### STANDARD OF REVIEW

¶ 19 We review a trial court's grant of summary judgment de novo. *Carmichael v. Beller,* 1996 OK 48, ¶ 2, 914 P.2d 1051, 1053. This Court must determine as a matter of law if the evidentiary material in the record, viewed in the light most favorable to the nonmoving party, supports the judgment. *Hargrave v. Canadian Valley Elec. Co-op., Inc.,* 1990 OK 43, ¶ 14, 792 P.2d 50, 55.

¶ 20 In a case involving an insurer's alleged breach of the implied duty of good faith and fair dealing, summary judgment for the

insurer has been held proper where a legitimate dispute existed between the parties as to the value of the insured's claim. *See Garnett v. Gov't Employees Ins. Co.,* 2008 OK 43, ¶ 23, 186 P.3d 935, 944; *Skinner v. John Deere Ins. Co.,* 2000 OK 18, ¶ 17, 998 P.2d 1219, 1223. Further, "[b]efore the issue of an insurer's alleged bad faith may be submitted to the jury, the trial court must first determine as a matter of law, under the facts most favorably construed against the insurer, whether the insurer's conduct may be reasonably perceived as tortious." *Garnett,* 2008 OK 43 at ¶ 23, 186 P.3d at 944.[8]

¶ 21 Questions of law determined by the district court on summary judgment are reviewed by this Court de novo. *Graham v. Travelers Ins. Co.,* 2002 OK 95, ¶ 8, 61 P.3d 225, 228; *Barnes v. Oklahoma Farm Bureau Mut. Ins. Co.,* 2000 OK 55, ¶ 4, 11 P.3d 162, 166.

### ANALYSIS

#### I. The Elements of Bad Faith

¶ 22 Pursuant to Oklahoma law, tort liability for breach of the implied covenant of good faith and fair dealing arises only "where there is a clear showing that the insurer unreasonably, and in bad faith, withholds payment of the claim of its insured." *Christian v. American Home Assurance Co.,* 1977 OK 141, ¶ 26, 577 P.2d 899, 905.[9] In *Badillo*

---

7. The transcript of the summary judgment hearing is included in the assembled record.

8. The district court's duty as gatekeeper is similar to that in (intentional infliction). The district court "must first determine, under the facts of the particular case and as a matter of law, whether insurer's conduct may be reasonably perceived as tortious. If the [court] so determines, the legal gate to submission to the jury of the issue of insurer's alleged bad faith conduct is open. However, until the facts, when construed most favorably against the insurer, have established what might be reasonably perceived as tortious conduct on the part of the insurer, the legal gate to submission of the issue to the jury remains closed." *City Nat'l Bank and Trust Co. v. Jackson Nat'l Life Ins.,* 1990 OK CIV APP 89, ¶ 18, 804 P.2d 463, 468–69.

9. The essence of the tort is failing to promptly pay a claim absent a reasonable belief that the claim is legally or factually insufficient. *Buzzard v. Farmers Ins. Co., Inc.,* 1991 OK 127, ¶ 14, 824

P.2d 1105, 1109. The Supreme Court has previously applied this tort in the following circumstances: (1) making settlement offers for less than the insurer's established minimum value of a valid claim, *Newport v. USAA,* 2000 OK 59 ¶ 17, 11 P.3d 190, 197; (2) conducting a biased investigation or determining the results of the investigation based on clearly unreliable expert evidence; *McCoy v. Okla. Farm Bureau Mut. Ins. Co.,* 1992 OK 43, ¶¶ 13–22, 841 P.2d 568, 571; (3) determining that a claim is legally or factually insufficient without proper investigation, or failing to seek available information that might aid an insured in proving a claim. *McCorkle v. Great Atlantic Ins. Co.,* 1981 OK 128, ¶¶ 3–7, 637 P.2d 583, 584; *Buzzard* at ¶¶ 15–16, 824 P.2d at 1109; and (4) refusing to pay based on unreasonable interpretations of law or policy provisions, or reliance on unreasonable legal advice. *Harrell v. Old American Ins. Co.,* 1991 OK CIV APP 91, ¶¶ 31–32, 829 P.2d 75, 79; *Barnes v. Oklahoma Farm Bureau Mut. Ins. Co.,* 2000 OK 55, ¶ 21, 11 P.3d 162, 171.

v. Mid Century Ins. Co., 2005 OK 48, ¶ 25, 121 P.3d 1080, 1093, the Court set forth the "essential elements" of a bad faith claim a plaintiff must show to make out a prima facie case, a case sufficient to warrant submission of the issue to the jury. In *Ball v. Wilshire Ins. Co.*, 2009 OK 38, 221 P.3d 717, a case in which the plaintiff alleged bad faith delay in payment of her UM claim, the Court stated:

> The elements of a bad faith claim against an insurer for delay in payment of first-party coverage are: (1) claimant was entitled to coverage under the insurance policy at issue; (2) the insurer had no reasonable basis for delaying payment; (3) the insurer did not deal fairly and in good faith with the claimant; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the claimant's injury. The absence of any one of these elements defeats a bad faith claim.

*Id.* at ¶ 21, 221 P.3d at 724 (footnotes omitted). Further, we note that to establish the tort of bad faith "the minimum level of culpability necessary for liability against an insurer to attach is more than simple negligence, but less than the reckless conduct necessary to sanction a punitive damage award against [the insurer]." *Badillo*, 2005 OK 48 at ¶ 28, 121 P.3d at 1094. *See also Bailey v. Farmers Ins. Co., Inc.*, 2006 OK CIV APP 85, ¶ 18, 137 P.3d 1260, 1264 ("Insurers are free to make legitimate business decisions (and mistakes) regarding payment, as long as they act reasonably and deal fairly and in good faith with their insureds.").

## II. Unreasonable Delay In Payment

¶ 23 Beers claims that NIC unreasonably delayed payment of his valid UM claim. Beers asserts basically two separate instances of bad faith conduct by NIC. The first is the delay between the date of NIC's internal decision to pay the full UM coverage amount and the date NIC notified Beers' attorney of that decision. The second is NIC's request, after it had decided Beers was entitled to the UM policy limit, for an executed release that included defend, indemnify and hold harmless provisions.

### A. The Period Of March 9 To May 18

■ ¶ 24 At the hearing on NIC's motion for summary judgment, Beers conceded that NIC's actions prior to March 9, 2007, did not constitute bad faith.[10] Accordingly, for purposes of determining whether NIC acted in bad faith towards Beers, we will consider the actions taken by NIC after its adjuster Adamson determined, on March 9, 2007, to offer Beers the full UM policy limit. The "critical question" is whether NIC had a good faith belief during this time period, *Ball*, 2009 OK 38 at ¶ 22, 221 P.3d at 725, "in some justifiable reason for the actions it took or omitted to take that are claimed violative of the duty of good faith and fair dealing." *Badillo*, 2005 OK 48 at ¶ 28, 121 P.3d at 1093–94. *See also Buzzard v. Farmers Ins. Co., Inc.*, 1991 OK 127, ¶¶ 13–14, 824 P.2d 1105, 1109.

¶ 25 The evidentiary materials of record establish that the delay between NIC's decision to extend the UM policy limit to Beers and notifying his attorney Green of that decision resulted from adjuster Adamson's decision to seek advice from NIC's counsel. Adamson testified that, because of her "history of dealing" with Green's office, and the absence of a signed medical authorization from Beers, she was concerned about there being unpaid medical providers after NIC paid the $50,000 UM to Beers and Green. Therefore, she sought advice of legal counsel in Oklahoma before issuing the settlement check, in order to protect NIC from potential exposure to double payments.

■ ¶ 26 The extensive correspondence between Adamson and attorney Green demonstrates factual and legal reasons for NIC's conduct, that Adamson's concerns were legitimate, and that NIC did not act in bad faith in seeking legal advice before offering the UM policy limit. Beers did not produce any contradictory evidence or any evidence suggesting NIC intentionally delayed payment during this period for an improper purpose. The record shows that NIC's decision to

---

10. Beers had also claimed that NIC acted unreasonably before March 9, 2007, by requesting unnecessary medical information in order to delay payment of his UM claim despite indisputable evidence that his medical bills exceeded Hillory's insurance policy limits.

consult with Oklahoma counsel before offering Beers the UM policy limit was reasonable. Where an insurer has demonstrated a reasonable basis for its actions, bad faith cannot exist as a matter of law. *See Manis v. Hartford Fire Ins. Co.*, 1984 OK 25, ¶¶ 7–8, 681 P.2d 760, 761–62; *Buzzard*, 1991 OK 127 at ¶ 14, 824 P.2d at 1109. Therefore, the district court's summary adjudication of Beers's bad faith claim based on the alleged unreasonable delay in payment between March 9 and May 18, 2007, was correct. That portion of the district court's judgment is affirmed.

### B. The Request For An Executed Release

■ ¶ 27 Beers claims that issues of fact remain regarding whether NIC breached the insurance contract and acted in bad faith when, in exchange for the UM benefits it had determined were due, NIC demanded that both he and attorney Green execute the Release. Beers argued before the district court that NIC's draft release covering "all claims, demands, damages, causes of action or suits of any kind ... under the UM coverage" foreclosed his right to sue NIC for bad faith. The district court found that this interpretation of the release proffered by Beers was not reasonable, and not intended by NIC.

¶ 28 There is no Oklahoma case law establishing a general prohibition against an insurer requesting its insured to execute a release on payment of the maximum amount insured by the policy. Further, if attorney Green refused to have Beers sign the Release because he believed it extinguished a viable bad faith claim, the record shows that Green never (1) communicated this concern to NIC, (2) gave NIC the opportunity to confirm that Beers was not required to release any potential bad faith claim, or (3) drafted and submitted a version of the release that he would have Beers sign. It was not unreasonable for NIC to condition payment of UM proceeds on a release of any future claims against that contract. The district court not-

ed that releases in UM cases are "a common business practice." [11] The district court did not err in finding that NIC did not engage in bad faith by requesting an executed release of contract claims, and that portion of the district court's order is affirmed.

### C. The Release's Defend, Indemnify And Hold Harmless Provisions

■ ¶ 29 Beers also argued before the district court that NIC acted in bad faith by conditioning payment of the UM policy limit on execution of the Release because the Release was overly broad. Beers pointed out that the Unfair Claims Settlement Practices Act, 36 O.S.2001 §§ 1250.1 through 1250.17 (UCSPA), prohibits an insurer from requesting an insured "to sign a release that extends beyond the subject matter that gave rise to the claim payment." Section 1250.5(8). The district court found "that is clearly not the case here."

■ ¶ 30 The UCSPA proscribes certain conduct by an insurance company when resolving a claim with its insured, 36 O.S.2001 § 1250.5,[12] and provides the Insurance Commissioner with administrative remedies to regulate settlement practices by insurance companies. 36 O.S.2001 § 1250.13. It is well settled, however, that the UCSPA does not provide the insured with a private right of action against the insurer. *McWhirter v. Fire Ins. Exch., Inc.*, 1994 OK 93, ¶ 5, 878 P.2d 1056, 1057; *Walker v. Chouteau Lime Co.*, 1993 OK 35, ¶ 7, 849 P.2d 1085, 1087. Nonetheless:

> The bad-faith action may also be based upon an insurer's failure to perform an act that is derivative or secondary in nature; that is, an insurer's duty that owes its existence to a preexisting implied contractual, or statutory, or status-based duty arising from the insurer-insured relationship. For example, a duty to timely and properly investigate an insurance claim is intrinsic to an insurer's contractual duty to

---

11. In fact, the Unfair Claims Settlement Practices Act, discussed further in Part II(c) of this Opinion, recognized this business practice by only prohibiting a release that extends beyond the subject matter of the payment. 36 O.S.2001 § 1250.5(8).

12. Section 1250.5 was amended effective July 1, 2010. This section of the UCSPA sets forth acts that may constitute an unfair claim settlement practice.

timely pay a valid claim. Similarly, bad-faith actions have been based upon an insurer's failure to follow judicial construction of insurance contracts or available applicable law, as well as upon duties that are necessary for an insurer's timely determination of a claim.

*Brown v. Patel*, 2007 OK 16, ¶ 11, 157 P.3d 117, 122 (footnotes omitted). Therefore, the UCSPA can provide the district court with guidance in determining whether particular conduct on the part of an insurer is unreasonable and sufficient to constitute a basis for a bad faith claim.

¶ 31 However, when relying on the UCSPA to establish a breach of the insurer's duty, two caveats are critical. First, breach of a duty imposed by section 1250.5 is not a violation of the Act. A violation occurs only if the insurer's failure to conform to some requirement of the statute is found to be flagrant or to constitute a business practice.[13] Second, a violation of the Act does not necessarily establish bad faith. An insurer may carelessly fail to perform some duty required by the statute with such frequency to warrant administrative sanction, but that does not establish more than negligent conduct in any individual case.

¶ 32 The specific language of section 1250.5(8), prohibiting an insurer from demanding that the insured "sign a release that extends beyond the subject matter of the claim payment," indicates that the Legislature recognized, as did the district court, that some releases used in insurance industry practice are appropriate. Although it was not bad faith for NIC to ask Beers to sign a release, the reasonableness of NIC's action in demanding that Beers and attorney Green execute a release with defend, indemnify and hold harmless provisions, in addition to a release of contract claims, must be "judged in light of the applicable law." *Timmons v. Royal Globe Ins. Co.*, 1982 OK 97, ¶ 20, 653 P.2d 907, 914. For purposes of this bad faith action, "the question remains whether such conduct was legitimate and reasonable." *Brown v. Patel*, 2007 OK 16 at ¶ 38, 157 P.3d at 129. Based on our de novo review, this Court finds that reasonable persons could conclude that NIC requested more than it was entitled to request from its insured Beers.

¶ 33 In evaluating this aspect of Beers's bad faith claim, NIC had the contractual right to request necessary claim documentation from Beers, and, pursuant to the provisions of 36 O.S. Supp.2004 § 3636(F), Beers was obligated to provide a signed medical authorization and medical bills to aid NIC in its investigation. However, NIC also argued that the defend, indemnify and hold harmless provisions were necessary to protect it against liability to lienholders after it paid the $50,000 UM policy limit to Beers.[14] Examination of the applicable Oklahoma lien statutes, however, fails to support this concern.

¶ 34 Only valid liens filed by physicians pursuant to 42 O.S.2001 § 46 may attach to an insured's UM coverage.[15] Section 46 au-

---

**13.** Section 1250.3 of the Act provides:
B. It is an unfair claim settlement practice for any insurer to commit any act set out in Section 1250.5 of this title, or to commit a violation of any other provision of the Unfair Claims Settlement Practices Act, if:
1. It is committed flagrantly and in conscious disregard of this act or any rules promulgated hereunder; or
2. It has been committed with such frequency as to indicate a general business practice to engage in that type of conduct.

**14.** NIC argued not only that its actions were reasonable, but also that it had "a legal obligation to protect the interests of the lienholders by ensuring that liens have been satisfied before tendering payment of any settlement proceeds." NIC cites no authority creating such an obligation, and we find none. The risk is not to the

interest of the lienholder, who may enforce a properly perfected lien against the insurer irrespective of payment to the insured. It is in the insurer's interest to protect against the risk of "double payment."

**15.** Compare *Kratz v. Kratz*, 1995 OK 63, 905 P.2d 753 (statute giving hospital lien over patient's recovery of damages for accident does not permit enforcement of such lien against uninsured motorist (UM) benefits paid by patient's own insurer), with *Broadway Clinic v. Liberty Mut. Ins. Co.*, 2006 OK 29, 139 P.3d 873 (statutory physician's lien on monies payable by insurer to injured person attaches to the proceeds of a patient's uninsured motorist (UM) coverage). Section 46 was amended effective November 1, 2008, to include other "professional person[s] licensed under Title 59 of the Oklahoma Statutes who

thorizes liens by physicians in two circumstances: (1) "if the injured person asserts or maintains a claim against [another] for damages," or (2) "if the injured person asserts or maintains a claim against an insurer." Section 46(A). Neither lien is effective unless the physician files the lien:

> on the mechanic's and materialman's lien docket in the office of the county clerk of the county where the principal office of the physician is located, a written notice setting forth an itemized statement of the amount claimed, identifying the insurance policy or policies against which the lien is asserted.

Section 46(C)(1).[16]

¶ 35 Consequently, Oklahoma's lien statute protects NIC from the concern it expressed as justifying its request for execution of the defend, indemnify and hold harmless provisions of the release, and therefore provides the protection NIC sought to obtain from Beers and attorney Green. The reasonableness of NIC's request for execution of these provisions cannot be determined as a matter of law on the basis of this record.

 ¶ 36 Where the record contains evidentiary materials that permit differing inferences regarding the reasonableness of an insurer's conduct, then what is reasonable is always a question to be determined by the jury on consideration of the circumstances of the case. *See Badillo* at ¶ 28, 121 P.3d at 1093; *Newport v. USAA,* 2000 OK 59, ¶¶ 10–11, 11 P.3d 190, 195–96; *McCorkle v. Great Atlantic Ins. Co.,* 1981 OK 128, ¶ 21, 637 P.2d 583, 587. Here, the question of whether NIC's inclusion of, and demand that, Beers and attorney Green sign the defend, indemnify and hold harmless provisions, constituted unreasonable conduct is a question of fact that remains in dispute. Summary judgment on this aspect of Beers's claim was not proper and is reversed.

### III. Issues Of Fact Regarding NIC's Advice From Counsel

 ¶ 37 This Court has previously determined, in Part II(A) of this Opinion, that NIC acted reasonably in seeking Oklahoma counsel's advice before communicating to Beers its offer to settle for policy limits. If the advice an insurer receives from its counsel regarding the handling of a UM claim is contrary to the dictates of section 3636, existing case authority, or in direct conflict with an express provision of the insurance contract, then it is unreasonable for the insurer to rely on that advice. *Barnes,* 2000 OK 55 at ¶¶ 17–18, 11 P.3d at 169–70. Nonetheless, reliance on the advice of counsel can be a defense to a bad faith claim, but the insurer's reliance on that advice must, itself, be reasonable. *See Barnes,* 2000 OK 55 at ¶¶ 31–32, 11 P.3d at 174.

¶ 38 The record before this Court contains no evidence of what advice NIC's adjuster Adamson received from counsel, or whether the Release she forwarded for signature reflected that advice. Assuming that the requirements of the Release were drafted pursuant to the recommendations of NIC's counsel, the current record demonstrates neither the reasonableness of that advice, nor NIC's reliance thereon. Therefore, the district court's judgment cannot be sustained on the basis that NIC relied on the advice of counsel in its actions.

### CONCLUSION

¶ 39 In his response and objection to NIC's motion for summary judgment, Beers argued that NIC's delay in extending the offer of policy limits was unreasonable and in bad faith. Beers also argued that the terms of the Release required him to waive any bad faith tort claim he might have against NIC. The district court correctly ruled, as a matter of law, that (1) it was reasonable for NIC to consult with counsel between March 9 and May 18 before communicating the settlement offer to Beers; (2) contrary to the construc-

---

perform medical or healing arts within their scope of practice."

**16.** Section 46(C)(2) also requires the physician to:

send[ ], by registered or certified mail, postage prepaid, a copy of such notice with a statement of the date of filing thereof to the person, firm, or corporation against whom the claim is made. . . .

tion argued by Beers, the terms of the Release were not intended by NIC to foreclose his right to assert a bad faith tort claim; and (3) it was not unreasonable for NIC to demand a release of the contract claims before tendering payment of the UM policy limit. We affirm these rulings. Otherwise, the record fails to establish that NIC was entitled to judgment as a matter of law. Except as to the three issues this Court has identified as appropriate for summary adjudication, the judgment of the district court is reversed. The case is remanded for further proceedings consistent with this Opinion.

¶40 **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.**

WISEMAN, C.J., and BARNES, J., concur.